# Morris, Nichols, Arsht & Tunnell LLP

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

302 658 9200
302 658 3989 Fax

Karen Jacobs Louden
302 351 9227
302 425 4681 Fax
klouden@mnat.com

ORIGINAL FILED: October 15, 2007

PUBLIC VERSION FILED: October 22, 2007

**By E-Filing And Hand**

The Honorable Gregory M. Sleet
United States District Court
844 N. King Street
Wilmington, DE 19801

        Re:   *Linear Technology Corp. v. Monolithic Power Systems, Inc.*,
               C.A. No. 06-476 (GMS)

Dear Chief Judge Sleet:

        Linear Technology Corporation ("Linear") responds to Monolithic Power Systems' ("MPS") letter request to file four summary judgment motions. These requests should be denied. They are not dispositive of the entire case; and they advance positions that are contradicted by the testimony of MPS's own witnesses, are contrary to findings of the International Trade Commission ("ITC"), and are riddled with genuine issues of material fact.

**MPS HAS BREACHED THE SETTLEMENT AND LICENSE AGREEMENT**

        In Section 3.3 of the Settlement Agreement ("SA") (D.I. 92, Ex. 1), MPS agreed not to sell any products in which the

**REDACTED**

        MPS is not entitled to summary judgment on Linear's breach of contract claims because there is clearly at least an issue of fact on whether the MP1543 indeed

**REDACTED**

        First, MPS's interpretation of the SA is legally incorrect and is contrary to the sworn testimony of MPS's own CFO and Rule 30(b)(6) designee, Rick Neely. MPS takes the position that it merely agreed in Section 3.3 to avoid using the precise circuit previously employed.[1] The record reveals, however, that John England, Linear's patent counsel and chief

---

[1]    Linear does not contend, as MPS states, that "MPS agreed never to do anything that Linear might allege to infringe its patents." But MPS did, in order to avoid a trial in the ITC, agree that it

(continued . . .)

Hon. Gregory M. Sleet
October 15, 2007
Page 2

negotiator, added the phrase

**REDACTED**

**REDACTED**

**REDACTED**

MPS has attempted to change Mr. Neely's sworn testimony by submitting an errata sheet with its letter that mirrors MPS's counsel's position. That is improper under Rule 30(e), Fed. R. Civ. P., and the "errata" should be disregarded for purposes of MPS's proposed motion. *See e.g., Mann v. GTCR Golder Rauner, LLC*, 2006 US. Dist. LEXIS14115 (D. Ariz. March 28, 2006). At the very least, Mr. Neely's sworn testimony remains available to the jury for it to assess Mr. Neely's credibility based on his attempted change of testimony. This presents a classic issue of fact that cannot be resolved on summary judgment.[2]

Second, though not labeled as such, there is ample evidence that the MP1543 contains **REDACTED**
Linear's opening expert report clearly identifies such circuitry in the MP1543, and in particular, explains how, **REDACTED**

MPS cannot escape its contractual obligations by simply giving that circuitry a set of initials other than          as part of its nomenclature.

---

(. . . continued)

**REDACTED**

---

[2] MPS also argues that this lawsuit is not a suit to enforce the settlement agreement because Linear alleges that MPS infringes additional claims that were not "Asserted Claims" in the ITC proceeding. The fact that MPS infringes additional claims does not relieve MPS of its breach of contract with respect to the Asserted Claims.

Hon. Gregory M. Sleet
October 15, 2007
Page 3

## THE LIQUIDATED DAMAGES CLAUSE OF SECTION 6.1 IS ENFORCEABLE

MPS's argument that the liquidated damages clause in the SA is a penalty provision clearly is not amenable to summary judgment because MPS cannot begin to overcome the presumed validity of the provision, and certainly not as a matter of law. To begin with, MPS was represented by more than six attorneys when it agreed to pay <sup>REDACTED</sup> in liquidated damages if it breached. (SA ¶ 6.1) Indeed, MPS's lawyers actually drafted the liquidated damages clause they now assert is unenforceable.

Liquidated damages provisions are favored and presumed valid under California law, which governs in this action (SA at §6.1). *Weber v. Christian*, 52 Cal. App. 4th 645, 654, 656 (Cal. Ct. App. 1997). By California statute, "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal Civ Code § 1671(b). The issue of reasonableness under the circumstances is a classic issue of fact not amenable to summary judgment.

That is particularly true here, because the statute gives "parties considerable leeway in determining the damages for breach." *Weber*, Cal. Ct. App. 4th at 654. A liquidated damages provision is unreasonable only "if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from the breach. The amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.'" *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (Cal. 1998). Only if the liquidated damages amount is disproportionate to the damages anticipated at the time the contract was made may it be deemed an unenforceable penalty. *Id.*

Among the factual issues relevant to the reasonableness issue are "the relative equality of the bargaining power of the parties, whether the parties were represented by lawyers at the time the contract was made, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract." *Weber*, Cal. Ct. App. 4th at 654-55. On summary judgment, all inferences must be drawn in favor of Linear. Linear and MPS are both sizable companies, both of which were represented by able counsel in extensive ITC proceedings. Moreover, Lothar Maier, Linear's CEO and a signatory to the SA, testified that the <sup>REDACTED</sup> liquidated damages figure represented the "minimum potential loss" that Linear would incur if it had to enforce the SA against MPS's continued infringement of Linear's patents, despite its promise not to do so. 8/24/07 Maier dep. (Ex. 4), at 23:11-18 to 24:13. He explained that this would include the harm to Linear's business if a competitor sold an infringing product in the marketplace and the costs associated with enforcing the SA, such as the resources Linear personnel and engineers would have to expend to analyze infringing products

Hon. Gregory M. Sleet
October 15, 2007
Page 4

and otherwise prepare for trial.³ *Id.* Mr. Neely, MPS's CFO, also confirmed that Linear stated that the ᴿᴱᴰᴬᶜᵀᴱᴰ liquidated damages figure was needed to ensure it could enforce the SA. 8/10/07 Neely dep. (Ex. 2), at 77:2 to 78:3.

## THE MP1543 INFRINGES THE ASSERTED CLAIMS

There are clear factual disputes over infringement that must be resolved at trial. First, contrary to MPS's assertion, Linear's infringement theory has not changed. What has changed throughout this case is MPS's presentation of its circuit schematics. In February 2007, MPS produced an "incorrect" set of circuit schematics for the MP1543. This set of circuit schematics did not have the ᴿᴱᴰᴬᶜᵀᴱᴰ signal that Linear has identified as the "second control signal," but instead had the ᴿᴱᴰᴬᶜᵀᴱᴰ signal that Linear originally identified as the "second control signal." In April 2007, however, MPS explained that this first schematic set contained circuitry considered for its preliminary design reviews. At the same time, MPS produced the "correct" set of circuit schematics for the final MP1543 production part, which had both the ᴿᴱᴰᴬᶜᵀᴱᴰ and ᴿᴱᴰᴬᶜᵀᴱᴰ signals. Then on August 21, 2007, Linear deposed the MPS corporate witness on the structure and operation of the MP1543 product. That deposition clarified that the ᴿᴱᴰᴬᶜᵀᴱᴰ signal was indeed the "second control signal" for the MP1543 product.

## REDACTED

In addition, as Linear addressed in its claim construction briefing, all of MPS's non-infringement positions rely on a proposed claim construction that ignores and avoids the preferred embodiments that are disclosed in the patents-in-suit. MPS's non-infringement argument on "maximum rated output current" is also based on the erroneous proposition that a part's data sheet must state a specification for a "maximum rated output current" in those *exact* words for infringement to exist. Of course that cannot be correct because it would permit an infringer to escape liability by semantics on data sheets and by not disclosing how the parts actually work. Furthermore, MPS's assertion that there is no infringement because the MP1543 supposedly is not a voltage regulator has no merit. The data sheet calls it a "Step-up Converter," and MPS's corporate designee testified that he was unaware of any document that showed the application of the MP1543 to be anything other than that. 8/21/07 Chen deposition (Ex. 5), at 37:6-43:22.

---

[3] MPS's argument that the liquidated damages clause must be intended to penalize MPS because the SA does not preclude the remedies available for infringement under the patent statute ignores that one function of liquidated damages is to ensure that Linear could enforce the SA cost-effectively. Because the costs associated with enforcing a patent license often are not remedied by the patent statute, the parties agreed to compensate Linear for such litigation costs through the use of a liquidated damages provision. *See Poseidon Development, Inc. v. Woodland Lane Estates, LLC*, 152 Cal. App. 4th 1106, 1115 (Cal. Ct. App. 2007)(noting that a liquidated damages clause may be used to account for the cost of litigation if breach occurs).

Hon. Gregory M. Sleet
October 15, 2007
Page 5

MPS's other non-infringement arguments would require the Court to rewrite the Asserted Claims to *specify* a particular *numerical* "threshold fraction" at which point the "second control signal" is generated. Claims 1, 2, and 34 implicate generation of a "second control signal" if the output current "falls below a threshold fraction of a maximum rated output current for the regulator," but they do not require a specific *numerical* quotient representing the "threshold fraction." Nor do they require a fixed "threshold fraction," because Fig. 9 of the patents-in-suit (and claim 32 of the '178 patent) plainly embraces a step-up voltage regulator with a variable threshold fraction.

Moreover, for its remaining non-infringement arguments (*i.e.*, "substantially at the regulated voltage" and "second state of circuit operations"), MPS resorts to claim construction positions that were rejected in prior litigations involving the patents-in-suit. Specifically, MPS's proposed constructions for "substantially at the regulated voltage" and "second state of circuit operations" were rejected by the Northern District of California and the ITC.

**MPS AGREED THAT IT WOULD NOT CHALLENGE THE VALIDITY OF THE PATENTS IN THIS ACTION; AND THE ITC HAS ALREADY REJECTED THE SAME INVALIDITY ARGUMENTS MADE BY MPS**

As described in detail in Linear's motion to strike MPS's defenses of invalidity and unenforceability (D.I. 11), MPS agreed in the SA that it would not challenge the validity or enforceability of the '178 or '258 patents in any action to enforce the SA. For the reasons set forth in that motion, MPS has no viable invalidity or unenforceability defenses in this action.[4]

Moreover, the asserted claims are not invalid, and MPS certainly cannot meet its burden of establishing their invalidity by clear and convincing evidence as a matter of law. In fact, after a full proceeding the ITC, the Administrative Law Judge, and the Office of Unfair Import Investigations, each separately concluded that the '258 patent claims asserted in this case are not invalid in light of the prior art MPS cited in its letter to the Court (AN35). ITC Opinion (Ex. 6) at 61-62. Although the ITC's determination is not binding on this Court, MPS's implicit assertion that no reasonable jury could possibly find in favor of Linear on the issue of invalidity is contrary to both the presumption of validity and past rejections of invalidity assertions over the art on which MPS relies.

Respectfully,

*/s/ Karen Jacobs Louden*

Karen Jacobs Louden (#2881)

---

[4]  It is noteworthy that MPS (pointing to an e-mail from Mr. Neely addressing a different section [Section 6.1] of the SA) argued in opposition to that motion that "a factual dispute exists as to the meaning of the contractual terms and their application to disputed facts." D.I. 17 at 5.

Hon. Gregory M. Sleet
October 15, 2007
Page 6

cc: Clerk of the Court (by hand)
Joel M. Freed, Esquire (by email)
Richard L. Horwitz, Esquire (by email and hand)
Dean G. Dunlavey, Esquire (by email)

1263713

# EXHIBIT 1

## FULLY REDACTED

Case 1:06-cv-00476-GMS    Document 99-2    Filed 10/22/2007    Page 1 of 11

# EXHIBIT 2

## FULLY REDACTED

# EXHIBIT 3

## FULLY REDACTED

# EXHIBIT 4

## FULLY REDACTED

# EXHIBIT 5

## FULLY REDACTED

# EXHIBIT 6

CONFIDENTIAL VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| In the Matter of | |
|---|---|
| CERTAIN VOLTAGE REGULATORS, COMPONENTS THEREOF AND PRODUCTS CONTAINING SAME | Inv. No. 337-TA-564 |

## COMMISSION OPINION

On September 24, 2007, the Commission issued notice that it had determined (1) that there was a violation of section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, in the above-captioned investigation as to asserted claims 2, 3, and 34 of United States Patent No. 6,580,258, (2) that a limited exclusion order is the appropriate remedy for such violation, (3) that the remedy shall not extend to downstream products that contain the infringing articles, (4) that consideration of the public interest factors set out in 19 U.S.C. § 1337(d) does not preclude issuance of that remedy, and (5) that the amount of bond to permit entry during the Presidential review period should be set at 100 percent of the entered value of the involved articles. This opinion sets forth the reasons for the Commission's determinations.

## I. BACKGROUND

The Commission instituted this section 337 investigation on March 22, 2006, based on a complaint filed by Linear Technology Corporation of Milpitas, California ("Linear"). 71 *Fed. Reg.* 14545 (March 22, 2006). The complaint alleged violations of section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and the sale within the United States after importation of certain voltage regulators, components

**CONFIDENTIAL VERSION**

argues that since strong objective evidence of nonobviousness such as commercial success exists, LAN35 does not render the asserted sleep mode claims (claims 2, 3, and 34) obvious. IA Review Reply Brief 22.

In response to Linear's arguments that MAX782 does not anticipate claim 35 (Linear Review Brief 34-37), the IA argues that even if Linear has proven conception back to February 1991 (before the 1993 date of MAX782), Linear has not met its burden of proving either a prior reduction to practice or the required diligence. IA Review Reply Brief 19-21.

In response to Linear's arguments that the statements of Maxim's CEO Jack Gifford concerning their licensing of the '258 patent (that "there wasn't any prior art that was strong" and that [Redacted] preclude a finding of anticipation of claim 35 (Linear Review Brief 35-36), the IA argues that the statement was broadly directed to the entire '258 patent (including sleep mode claims and the reverse current claim) and it is possible that the statement applied to only the sleep mode claims and not the reverse current claim. IA Review Reply Brief 21. Thus, the possibility exists, the IA argues, that Maxim settled in reponse to the existence of prior art to the sleep mode claims and not the reverse current claim, and that the MAX782 still constitutes invalidating prior art as to claim 35. IA Review Reply Brief 21 (citing *Gemstar-TV Guide Int'l, Inc. v. U.S. Int'l Trade Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004) (standing for the proposition that inventorship is determined on a claim-by-claim basis)).

**CONFIDENTIAL VERSION**

Determination

We agree that it may be more difficult for AATI to meet its burden of showing invalidity in light of the fact that during the prosecution of the '258 patent the examiner had the LAN35, LAN19, and Figure 1 prior art before him. See Ultra-Tex Surfaces, 204 F.3d at 1367. Linear Review Brief 29; Linear Pet. Resp. 5-6, 26. We also agree with the IA with respect to the validity of claims 2, 3, and 34. IA Review Reply Brief 22, IA Pet. 1. In our view, AATI's validity challenges (based on the LAN35, LAN19, etc.) do not provide clear and convincing evidence that these asserted claims are invalid, taking into account our broader claim construction.

As to claims 2, 3, and 34, with respect to AATI's validity argument based on LAN35 and various combinations of LAN35, we agree with Linear and the IA that LAN35 is an <u>asynchronous</u> switching voltage regulator as opposed to a <u>synchronous</u> switching voltage regulator, and that LAN35 therefore does not disclose the second switching transistor required by the asserted claims. Linear Review Brief 31-33, IA Review Reply Brief 22. We find this significant, since asynchronous and synchronous switching regulators vary the power switch duty cycle in very different ways (e.g., asynchronous switching regulators are not as efficient at low load current as synchronous switching regulators). See RX-619C at 11. Furthermore, the control circuitry for synchronous regulators is much more complex than that of asynchronous regulators due to having to provide circuitry for driving a second transistor and due to having to include circuitry to include brief deadtimes during switching (i.e., where both transistors are turned OFF) to make sure that the two transistors do not cross-conduct (a condition where

61

**CONFIDENTIAL VERSION**

current flows from the battery or voltage source and through the two transistors to ground, instead of to the load). See RX-619C at 10. In our opinion, an asynchronous switching regulator having a single transistor and a diode fails to anticipate or meet the limitation of the asserted claims of a pair of synchronous switching transistors. Thus, it is our view that LAN35 cannot anticipate claims 2, 3, and 34.

Likewise, we agree with Linear that due to the significant differences in circuitry between asynchronous and synchronous switching regulators, discussed supra, it would not have been obvious to one of ordinary skill in the art at the time of the '258 patent to have substituted a pair of transistors for the transistor and diode of LAN35 to achieve the claimed invention. Linear Review Brief 40-45, Linear Resp. 9.

With respect to the combination of LAN35 with LAN19, we agree with Linear that LAN19 discloses replacing a transistor with a diode, which is exactly opposite and actually teaches away from what AATI asserts LAN19 stands for - the proposition that it would have been obvious to modify LAN35's asynchronous switching regulator by replacing the diode with a second transistor to create a synchronous switching regulator. Linear Pet. Resp. 19. In other words, LAN19 discloses replacing transistors with diodes but not replacing diodes with transistors.

With respect to the combination of LAN35 with the Figure 1 prior art, we agree with Linear that it would not have been obvious to one of ordinary skill in the art to combine the circuitry of these vastly different types of switching regulators (i.e., the asynchronous switching regulator of the LAN35 and the synchronous switching regulator of the Figure 1 prior art). Linear Review Brief 40-43. Even if one of ordinary skill in the

CONFIDENTIAL VERSION

art would be motivated to combine the on/off transistor control circuitry of the LAN35 (assumedly for the top transistor, since LAN35 has no bottom transistor) with the synchronous switching regulator of the Figure 1 prior art as suggested by AATI (AATI Review Reply Brief 89), the resultant regulator would still not meet the limitation of claim 35 of a "third circuit for generating a second control signal during a second state of circuit operation to cause both switching transistors to be OFF for a first period of time during which the output capacitor maintains the output substantially at the regulated voltage." This important sleep mode aspect of the asserted claims of the '258 patent is neither taught nor suggested by the on/off circuitry from the Figure 1 prior art, by the asynchronous regulator of the LAN35, or in any possible combination thereof.

We agree with AATI and the IA with regard to the invalidity of claim 35. In our view, a circuit that monitors voltage does not meet the requirement of claim 35 of monitoring current, and the ALJ correctly determined that claim 35 of the '258 patent does not have an invention date prior to March 23, 1993 (the effective U.S. filing date of the '258 patent). We agree with the IA that Linear has not established that the breadboard circuit tested in August 1991 constitutes a reduction to practice of claim 35 which requires "monitoring the current to the load" to generate a control signal when the monitored current falls below the "current threshold." IA Review Reply Brief 20-21. "In order to establish actual reduction to practice, the inventor must prove that he constructed an embodiment . . . that met all the limitations of the claim." *Slip Track Systems, Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1265 (Fed. Cir. 2002) (emphasis added). Linear has at best established reduction to practice of a circuit that [Redacted]