**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LINEAR TECHNOLOGY CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-476 (GMS) |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| MONOLITHIC POWER SYSTEMS, INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |

**MONOLITHIC POWER SYSTEMS, INC.'S BRIEF IN OPPOSITION TO LINEAR**
**TECHNOLOGY CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON**
**CONTRACT INTERPRETATION AND BREACH OF CONTRACT**

OF COUNSEL:

Dean G. Dunlavey
Mark D. Kachner
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Tel: (714) 540-1235

Mark A. Flagel
Robert Steinberg
Sean S. Pak
Latham & Watkins
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Tel: (213) 485-1234

David McKone
Latham & Watkins LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Tel: (312) 777-7316

Dated: December 12, 2007
Public Version Dated: December 19, 2007
838634/ 30611

Richard L. Horwitz (#2246)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, Delaware 19889-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
kdorsney@potteranderson.com

*Attorneys for Defendant*
*Monolithic Power Systems Inc.*

# TABLE OF CONTENTS

**Page**

I.  NATURE AND STAGE OF THE PROCEEDING............................................................1

II.  SUMMARY OF ARGUMENT ........................................................................1

III.  STATEMENTS OF FACTS ..........................................................................6

IV.  ARGUMENT ..............................................................................................7

    A.  The Settlement Agreement Does Not Cover The MP1543; It Covers Only the MP1556-1559 And Products That Contain "The ZX Circuitry Identified By Counsel For Linear In The ITC Proceeding" ....................................7

    B.  The Undisputed Evidence Is That The MP1543 Does Not Contain "The ZX Circuitry Identified By Counsel For Linear In The ITC Proceeding"................................................................................................8

    C.  Linear Cannot Re-Write The Settlement Agreement To Cover Different Circuitry Than The ZX Circuitry Its Attorneys Identified In The ITC Proceeding.....................................................................................11

    D.  Linear Cannot Re-Write The Settlement Agreement To Cover Infringement Generally.....................................................................12

    E.  Linear's Attempt To Use Extrinsic Evidence To Contradict The Plain Meaning Of The Settlement Agreement Is Improper And Unavailing................16

        1.  Extrinsic Evidence May Not Be Used To Contradict The Plain Language Of A Contract....................................................................16

        2.  The Extrinsic Evidence Cited By Linear Cannot Alter The Plain Language Of The Settlement Agreement .................................................17

        3.  The Actual Extrinsic Evidence – Ignored By Linear – Supports MPS's Position And The Plain Language Of The Settlement Agreement.........................................................................................19

    F.  MPS May Properly Challenge The Validity And Enforceability Of The Patents-In-Suit......................................................................................21

        1.  Linear Cannot Re-Write The Settlement Agreement To Turn "Validity" Into "Validity and Enforceability" ...........................................23

        2.  Linear Is Asserting Patent Claims In This Action That Were Not Asserted In The ITC Proceeding...............................................................24

V.  CONCLUSION..........................................................................................25

i

# TABLE OF AUTHORITIES

## CASES                          Page(s)

*A.B. Chance Co. v. RTE Corp.*,
854 F.2d 1307 (Fed. Cir. 1988) ............................................................................. 23

*AIU Ins. Co. v. Superior Court (FMC Corp.)*,
799 P.2d 1253, 51 Cal. 3d 807 (1990) ..................................................................... 5

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................ 2, 9

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
80 Cal. Rptr. 2d 329, 68 Cal. App. 4th 445 (1998) .................................. 4, 13, 15, 16

*Cook Inc. v. Medtronic, Inc.*,
No. C 06-00333 JSW, 2006 U.S. Dist. LEXIS 47073 (N.D. Cal. June 29, 2006) .............. 15, 16

*Donald M. Durkin Contr., Inc. v. City of Newark*,
C.A. No. 04-163 GMS, 2006 U.S. Dist. LEXIS 68221 (D. Del. Sept. 22, 2006) ..................... 19

*Flex-Foot, Inc. v. CRP, Inc.*,
238 F.3d 1362 (Fed. Cir. 2001) ............................................................................. 22

*Foad Consulting Group, Inc. v. Musil Govan Azzalino*,
270 F.3d 821 (9th Cir. 2001) ............................................................................ 17, 20

*In re Bennett*,
298 F.3d 1059 (9th Cir. 2002) ............................................................................... 17

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
976 F.2d 1559 (Fed. Cir. 1992) ............................................................................. 23

*New York Life Ins. Co. v. Hollender*,
237 P.2d 510, 38 Cal. 2d 73 (1951) ......................................................................... 4

*Norian Corp. v. Stryker Corp.*,
363 F.3d 1321 (Fed. Cir. 2004) ............................................................................. 23

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
442 P.2d 641, 69 Cal. 2d 33 (1968) ........................................................................ 17

*Shaw v. Regents of the University of California*,
67 Cal. Rptr. 2d 850, 58 Cal. App. 4th 44 (1997) ........................................... 3, 5, 12, 17

*Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n*,
223 Cal. Rptr. 175, 177 Cal. App. 3d 726 (1986) ............................................. 4, 5, 13

*Titanium Metals Corp. v. Elkem Mgmt., Inc.*,
    191 F.R.D. 468 (W.D. Penn. 1998) .......................................................................... 19

*Winet v. Price*,
    6 Cal. Rptr. 2d 554, 4 Cal. App. 4th 1159 (1992) ...................................... 16

## **STATUTES**

Cal. Civ. Code § 1636 ........................................................................................ 3, 12

Cal. Civ. Code § 1638 ..................................................................................... 3, 4, 12

Cal. Civ. Code § 1641 ................................................................................... 4, 13, 23

Cal. Civ. Proc. Code § 1858 .................................................................................. 24

## **RULES**

Fed. R. Civ. P. 30(e) ............................................................................................. 19

Fed. R. Civ. P. 56(c) ............................................................................................ 2, 9

## **OTHER AUTHORITIES**

8A Charles A. Wright *et al., Federal Practice & Procedure* § 2118 (1994) ................................ 19

## I.    NATURE AND STAGE OF THE PROCEEDING

Linear Technology Corporation ("Linear") has accused Monolithic Power Systems ("MPS") of infringing U.S. Patent Nos. 5,481,178 and 6,580,258 (the "patents-in-suit") and of breaching a settlement agreement. Although MPS has recently requested a teleconference with the Court to discuss the possibility of moving the trial date to accommodate the trial schedules of two of MPS's attorneys, trial in this proceeding currently is scheduled for April 28, 2008. The pre-trial conference is scheduled for April 2, 2008. Fact discovery is finished. Opening and answering expert reports have been exchanged. Expert depositions are scheduled to be concluded by December 13, 2007.

During the November 21, 2007 teleconference, the Court granted MPS's request for leave to file a motion for summary judgment on Linear's breach of contract claim and Linear's request for leave to file a cross-motion. MPS filed its Motion for Summary Judgment of No Breach of Contract (Count One) (D.I. 105) and accompanying opening brief ("MPS OB") (D.I. 106) on November 26, 2007. MPS incorporates that motion and the accompanying opening brief herein by reference.

## II.    SUMMARY OF ARGUMENT

1.    Linear's opening brief demonstrates that MPS, not Linear, is entitled to summary judgment as to Linear's breach of contract claim (Count One). The accused MP1543 product does not contain "the ZX circuitry identified by counsel for Linear in the ITC Proceeding" – the governing language of the parties' Settlement and License Agreement (the "Settlement Agreement"). Thus, the MP1543 necessarily falls outside the scope of conduct covered by the Settlement Agreement.

2.    Linear initially takes the clearly wrong position that the MP1543 contains "the ZX circuitry identified by counsel for Linear in the ITC Proceeding," but then retreats from that position and ultimately concedes that the MP1543 does not contain that specific circuitry. Instead, according to Linear, the MP1543 contains "a reverse current comparator *not precisely arranged as it was previously*." Linear Opening Brief ("Linear OB") (D.I. 108), at 9 (emphasis

added).  Linear's own description of the MP1543, even assuming it to be true, mandates

summary judgment in MPS's favor.  The Settlement Agreement says nothing about "reverse

current comparators" or circuitry that Linear might want to argue could be re-arranged somehow

to resemble something that was in the MP1556, which was the subject of the ITC investigation.

The Settlement Agreement covers "the ZX circuitry identified by counsel for Linear in the ITC

Proceeding."  That circuitry is not present in the MP1543 – period.

      3.      Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to summary judgment

as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).

      4.      Since Linear has the burden of proof at trial as to its breach of contract claim,

MPS needs only to point to a lack of evidence.  MPS has no burden to disprove Linear's claim.

*Celotex*, 477 U.S. at 322-24.  Linear had to come forward with evidence demonstrating a genuine

issue as to a material fact, and such evidence must consist of more than mere denials or

assertions that a fact is challenged.  *Id.*  Since Linear has failed to make a sufficient factual

showing as to an element of its case on which it bears the burden of proof at trial, the "plain

language of Rule 56(c) mandates the entry of summary judgment."  *Id.*, at 322.

      5.      Linear has no evidence that the MP1543 contains "the ZX circuitry identified by

counsel for Linear in the ITC Proceeding."  Linear has served ***three reports from its technical***

***expert*** in this case – including an unauthorized "supplemental" expert report served in the

evening hours of November 27, 2007. ***Not one of these reports contains a single statement to***

***the effect that the MP1543 contains the ZX circuitry identified by counsel for Linear in the***

***ITC Proceeding.***  Indeed, as MPS demonstrated in its own motion for summary judgment, the

MP1543 does not contain that circuitry.  The actual evidence is undisputed on that point.  Since

Linear has the burden of proof on its breach of contract claim and it has provided no evidence to

support the claim, MPS is entitled to summary judgment on that claim.

6.      Faced with this fatal problem in its breach of contract claim, Linear proceeds to argue that the Court should re-write the Settlement Agreement to replace the language "the ZX circuitry identified by counsel for Linear in the ITC Proceeding" with something like "circuitry based on a reverse current comparator" or "any circuitry that causes a product to go into sleep mode." This is impermissible. If that were the parties' agreement, that language would be in the Settlement Agreement.

7.      Linear proposes a novel "rationale" for its argument that the Settlement Agreement needs to be re-written: it states that "Linear employees were not allowed access" to documents at the ITC, so no one at Linear could have known what was in "the ZX circuitry identified by counsel for Linear in the ITC Proceeding." Linear OB (D.I. 108), at 9 n.8. Linear's "rationale," however, further demonstrates that it is MPS, not Linear, which is entitled to summary judgment. If the phrase "the ZX circuitry identified by counsel for Linear in the ITC Proceeding" was not intelligible to Linear, *it would not be in the Settlement Agreement*. If, in reality, the parties had agreed that MPS would not make products with "circuitry based on a reverse current comparator" or "any circuitry causing sleep mode," that language would be in the Settlement Agreement. It is not – because that was not the parties' agreement.

8.      If Linear really did not understand the term "the ZX circuitry identified by counsel for Linear in the ITC Proceeding" or thought that the term was unworkable because no one at Linear had access to the materials from the ITC proceeding, it had the obligation to inform MPS of that and see if the parties could reach a different agreement – one that contained different language. Linear could not remain silent on this issue only to later ask this Court to re-write the Settlement Agreement more to its liking. "Although the intent of the parties determines the meaning of the contract (Civ. Code, § 1636, 1638), the relevant intent is 'objective' – that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." *Shaw v. Regents of the University of California*, 67 Cal. Rptr. 2d 850, 856, 58 Cal. App. 4th 44, 54-55 (1997).

3

9.     Linear's opening brief contains more misdirection. Since the ZX circuitry identified by its counsel in the ITC proceeding is not present in the MP1543, Linear tries to ignore the plain language of the Settlement Agreement and argue that, as a matter of law, the agreement applies to *any* assertion of infringement by Linear against *any* MPS product, while also precluding *any* challenge to validity or enforceability. As MPS demonstrated in its motion for summary judgment, Linear is flatly wrong in this regard. The plain language of the Settlement Agreement demonstrates that a breach of section 3.3 requires the sale by MPS of either the MP1556-1559 products, or a product "in which *the ZX circuitry identified by counsel for Linear* in the ITC proceeding *is connected so as to"* do one of three things: (1) enter into "sleep mode," (2) enter into "reverse polarity protection," or (3) "otherwise practice the Asserted Claims."

10.     Under California law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641 (West 1985). "Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative or meaningless." *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 80 Cal. Rptr. 2d 329, 349, 68 Cal. App. 4th 445, 473 (1998), *citing New York Life Ins. Co. v. Hollender*, 237 P.2d 510, 514-15, 38 Cal. 2d 73, 81-82 (1951). "An interpretation which renders part of the instrument to be surplusage should be avoided." *Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n*, 223 Cal. Rptr. 175, 177, 177 Cal. App. 3d 726, 730 (1986) Linear's proposed interpretation would render virtually all of section 3.3 nugatory and surplusage. It would also be inconsistent the stipulated royalty provision of section 6.1.

11.     Linear improperly attempts to resort to extrinsic evidence to contradict the plain language of the Settlement Agreement. Under California law, where the contractual language is clear, the Court ascertains the parties' intent from the written terms and goes no further. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638 (West 1985). "Where contract language

4

is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further." *Shaw*, 67 Cal. Rptr. 2d at 855, 58 Cal. App. 4th at 53, *quoting Ticor Title Ins. Co. v. Employers Ins. of Wausau*, 48 Cal. Rptr. 2d 368, 373, 40 Cal. App. 4th 1699, 1707 (1995). "[I]f the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." *AIU Ins. Co. v. Superior Court (FMC Corp.)*, 799 P.2d 1253, 1264, 51 Cal. 3d 807, 822 (1990).

12.    Even if the language of the Settlement Agreement had been unclear (which it is not), the extrinsic evidence would support MPS, not Linear. Tellingly, Linear avoids informing the Court about extrinsic evidence which demonstrates that the parties understood the Settlement Agreement's plain language to mean what it says. For example,



13.    Linear also asks the Court to preclude any attack on patent validity. This not only would improperly expand the limited scope of the Settlement Agreement, but is directly contrary to Linear's own acknowledgement of that limited scope during the negotiations leading to its execution. Linear additionally seeks to have the Court re-write the term "validity" to mean "validity or enforceability," even though the concept of patent enforceability is nowhere mentioned in the Settlement Agreement. Furthermore, Linear ignores the fact that three of the claims it is asserting in this case – claims 1, 3 and 34 of U.S. Patent No. 6,580,258 – are not included in the Asserted Claims identified in the Settlement Agreement. Obviously, the Settlement Agreement could not cover those claims.

5

14.    The language of the Settlement Agreement is clear.  It does not cover the MP1543.  Linear's improper attempts to re-write the terms of the Settlement Agreement would transform it from a coherent, straightforward document into a mangled patchwork bearing no resemblance to the parties' agreement.  For these reasons, and the reasons set forth in MPS's own motion for summary judgment, Linear's motion should be denied. The Court should grant summary judgment to MPS and dismiss Linear's breach of contract claim.

## III.    STATEMENTS OF FACTS

The same facts relevant to MPS's motion for summary judgment are applicable here.  In particular:

In 2004, Linear initiated an ITC investigation, claiming that a then-shipping MPS product designated the MP1556 infringed various claims of the patents-in-suit.[1]  During the ITC proceeding, Linear's attorneys and experts examined the schematics of numerous MPS voltage regulator controller products.  After that process, Linear concluded that it would pursue infringement claims only as to the MP1556 and three products under development that utilized the same circuitry, *i.e.*, the MP1557, MP1558 and MP1559.  Linear's attorneys presented infringement claim charts as to these products. Ex. B to MPS OB (D.I. 106).  Linear did not accuse the majority of MPS's voltage regulator products of infringement.

The MP1556 did not enjoy significant commercial success, which made continued litigation unappealing to MPS.  In September 2005, Linear and MPS agreed to resolve their dispute by entering into the Settlement Agreement.  Consistent with Linear's infringement contentions, the Settlement Agreement addressed three categories of products:  (1) the MP1556, (2) the MP1557 through MP1559 products under development, and (3) "any other products in which the ZX circuitry identified by counsel for Linear in the ITC Proceeding is connected so as

---

[1] The same patents at issue in the ITC proceeding are at issue in this lawsuit.  Linear, however, is asserting three claims in this lawsuit that were not included in the nine "Asserted Claims" in the ITC proceeding and identified in the Settlement Agreement – specifically claims 1, 3 and 34 of U.S. Patent No. 6,580,258.  Clearly there can be no conceivable breach of the Settlement Agreement with respect to those patent claims.

to allow such products to enter into what Linear referred to as 'sleep mode,' 'reverse polarity

protection', or otherwise practice the Asserted Claims anywhere in the world." Settlement

Agreement (Ex. 3 to Linear OB (D.I. 109); Ex. A to MPS OB (D.I. 106)), §§ 3.2, 3.3, 6.1.

In 2006, MPS began marketing a voltage regulator controller designated the MP1543.

The MP1543 is a different type of controller than the MP1556-1559 products. The MP1543 is

designed to be used in what are called "boost" or "step-up" regulators – meaning that the output

voltage of the voltage regulator is higher than its input voltage. *See* Ex. C to MPS OB (D.I. 106)

(MP1543 datasheet). In contrast, the MP1556-1559 products were designed for use in what are

called "buck" or "step-down" regulators – meaning that the regulator's output voltage is lower

than its input voltage. *See, e.g.,* Ex. B to MPS OB (D.I. 106) (MP1556 claim chart, p. 1),

(MP1557 claim chart, p. 1), (MP1558 claim chart, p. 1), (MP1559 claim chart, p. 1). Thus, the

MP1543 has a fundamentally different topology and intended use. Furthermore, the MP1543

does not contain "the ZX circuitry identified by counsel for Linear in the ITC Proceeding" that

was present in the MP1556 through MP1559. Answering Expert Report of Defendant

Monolithic Power Systems, Inc.'s Expert Dr. Thomas Szepesi (Ex. D to MPS OB (D.I. 106)),

at 84-87.[2] This incontrovertible fact is further demonstrated by the absence of any opinion to the

contrary from Linear's expert.

## IV.    ARGUMENT

### A.    The Settlement Agreement Does Not Cover The MP1543; It Covers Only the MP1556-1559 And Products That Contain "The ZX Circuitry Identified By Counsel For Linear In The ITC Proceeding"

MPS and Linear entered into the Settlement Agreement to resolve their patent

infringement dispute in the ITC. At the time the Settlement Agreement was executed, Linear

had examined numerous MPS products and concluded that it would pursue infringement claims

---

[2] While MPS has provided affirmative evidence of this fact, it had no obligation to do so. Linear
has the burden of proof on its breach of contract claim. Linear produced no evidence to support
the proposition that the MP1543 contains "the ZX circuitry identified by counsel for Linear in
the ITC Proceeding."

only as to the MP1556-MP1559 products and "any other products in which the ZX circuitry identified by counsel for Linear in the ITC Proceeding is connected so as to allow such products to enter into what Linear referred to as 'sleep mode,' 'reverse polarity protection', or otherwise practice the Asserted Claims anywhere in the world." Settlement Agreement (Ex. 3 to Linear OB (D.I. 109); Ex. A to MPS OB (D.I. 106)), §§ 3.1, 3.2, 3.3. Further, Linear expressly agreed that "MPS products, such as the MP2104, that have the accused ZX circuitry disabled . . . do not infringe the Licensed Patents." *Id.*, § 3.3.

To constitute a breach of the Settlement Agreement, the ZX circuitry specifically identified by counsel for Linear in the ITC proceeding must be present and connected, *and* that circuitry must function to do one of three things: (1) enter into "sleep mode," (2) enter into "reverse polarity protection," or (3) otherwise practice the Asserted Claims. Since the MP1543 does not contain the ZX circuitry, its sales cannot constitute a breach of the Settlement Agreement.

### B.    The Undisputed Evidence Is That The MP1543 Does Not Contain "The ZX Circuitry Identified By Counsel For Linear In The ITC Proceeding"

Linear begins its opening brief by categorically – and incorrectly – stating that the accused MP1543 "contains the ZX circuitry identified in the ITC investigation." Linear OB (D.I. 108), at 1. Linear provides no evidence to support this bald assertion, which is not true and which Linear itself later disproves when it changes its position and states that the MP1543 contains "a reverse current comparator *not precisely arranged as it was previously*." *Id.*, at 9 (emphasis added).[3] Thus, Linear's own description of the MP1543 demonstrates that it does not contain "the ZX circuitry identified by counsel for Linear in the ITC Proceeding."

---

[3] Indeed, Linear's backpedaling begins on page 1 of its Opening Brief, where Linear implies that its statement concerning the ZX circuitry being present in the MP1543 is based on its contention that any "circuitry based on a reverse current comparator that allows the product to go into sleep mode" is somehow a synonym for "the ZX circuitry identified by counsel for Linear in the ITC Proceeding."

Linear has the burden of proof as to its breach of contract claim. Consequently, MPS need only point out that Linear has not produced any evidence the MP1543 contains "the ZX circuitry identified by counsel for Linear in the ITC Proceeding," which MPS has done. *Celotex*, 477 U.S. at 322-24. Linear had to come forward with evidence demonstrating a genuine issue as to that material fact. *Id.* Linear failed to do so – it came up with an unsupported, incorrect assertion from its attorneys which it subsequently contradicted. Since Linear has no evidence, the "plain language of Rule 56(c) mandates the entry of summary judgment." *Id.*, at 322.

It is telling that while Linear has served three reports from its technical expert in this case – including an unauthorized "supplemental" expert report served in the evening hours of November 27, 2007 – none contains a single statement to the effect that the MP1543 contains "the ZX circuitry identified by counsel for Linear in the ITC Proceeding." It should also be noted that Linear's technical expert in this case is the same person who served as its technical expert in the ITC proceeding and thus is intimately familiar with the ZX circuitry that Linear's counsel identified in that proceeding.

Pursuant to the Court's Scheduling Order, the opening report of Linear's technical expert was to contain whatever technical evidence Linear had to support its breach of contract claim. That opening report, served on October 1, 2007, said nothing to support a contention that the MP1543 contains "the ZX circuitry identified by counsel for Linear in the ITC Proceeding." Indeed, that report does not even mention the term "ZX."[4]

When MPS filed its opening Letter Brief on October 8, 2007, it expressly pointed out that "the MP1543 does not contain the previously accused ZX circuitry" and that Linear's technical expert "has not offered any opinion that the MP1543 contains the previously accused ZX

---

[4] Linear Exhibit 13, consisting of passages from its expert's report that Linear offers as support for its argument (Linear Opening Brief (D.I. 108), at 9 n.8), does not support Linear in the slightest. The report does *not* mention the term "ZX" at all, much less discuss the MP1543 within the context of "the ZX circuitry identified by counsel for Linear in the ITC Proceeding."

circuitry." Thus, Linear clearly knew by October 8 that MPS intended to rely upon the absence of evidence from Linear to support its motion for summary judgment.

Linear served the answering expert report of its technical expert on November 1, 2007. That report, like the opening report, contained nothing to support Linear's position concerning the ZX circuitry.

Although MPS has no obligation to provide affirmative evidence on this issue, it did so. In particular, the answering expert report of MPS's expert, Dr. Thomas Szepesi, served on November 1, 2007, demonstrated that the MP1543 does not contain "the ZX circuitry identified by counsel for Linear in the ITC Proceeding." (Ex. D to MPS OB (D.I. 106)), at 84-87.

Late in the evening of November 27, 2007, Linear served yet another report from its technical expert, supposedly rebutting comments in Dr. Szepesi's answering expert report. Yet Linear's unauthorized "Supplemental Expert Report," like the first two, failed to even mention the term "ZX," much less discuss the circuitry "identified by counsel for Linear in the ITC Proceeding," or attempt to rebut MPS's expert concerning the ZX circuitry. Thus, Linear has utterly failed to provide any evidence to support a contention that the MP1543 contains the ZX circuitry.

The Court also should take note of how easy it would have been for Linear to present this evidence, if any existed. Linear could have presented the schematic diagram for the ZX circuitry in the ITC proceeding and the schematic diagram for the MP1543 and shown the Court that the two diagrams depict the same circuitry. It did nothing of the sort – because the ZX circuitry is not in the MP1543.[5] Indeed, nowhere has Linear even attempted to identify for the Court what constituted "the ZX circuitry identified by counsel for Linear in the ITC Proceeding," much less

_____

[5] In this regard, it is particularly ironic for Linear to argue that MPS is somehow trying to avoid liability "by giving the circuitry a set of initials other than 'ZX.'" Linear Opening Brief (D.I. 108), at 1 and 9. To the contrary, it is Linear that wants to "win by labeling," as it wants to put a "ZX" label on circuitry that it admits is configured differently than the circuitry its attorneys identified in the ITC Proceeding.

show that it is actually present in the MP1543. Accordingly, MPS is entitled to summary judgment on Linear's breach of contract claim (Count One).

### C. Linear Cannot Re-Write The Settlement Agreement To Cover Different Circuitry Than The ZX Circuitry Its Attorneys Identified In The ITC Proceeding

Ultimately, Linear concedes that the MP1543 does not contain "the ZX circuitry identified by counsel for Linear in the ITC Proceeding." Instead, according to Linear, the MP1543 contains some unspecified circuitry which includes "a reverse current comparator *not precisely arranged as it was previously*" "that allows the product to go into sleep mode." Linear OB (D.I. 108), at 9 (emphasis added). The Settlement Agreement, however, says nothing about prohibiting "reverse current comparators" or circuitry that Linear might want to argue could be re-arranged somehow to resemble something that was in the MP1556. The Settlement Agreement covers "the ZX circuitry identified by counsel for Linear in the ITC Proceeding." That circuitry is not present in the MP1543 – period.

Linear's attempt to re-write the Settlement Agreement's specific reference to "the ZX circuitry" in terms of functionality is specious. As demonstrated above, the *first* predicate for finding a breach of the Settlement Agreement is that the accused product must contain "the ZX circuitry identified by counsel for Linear in the ITC Proceeding." Linear *must then establish* that the ZX circuitry is connected, and that it performs one of three functions: (1) it allows the product to enter into "sleep mode," (2) it allows the product to enter into "reverse polarity protection," or (3) it otherwise practices the Asserted Claims. Linear cannot satisfy this multi-level burden simply by arguing that there is some unspecified circuitry that allows the MP1543 to go into sleep mode.

Linear provides a novel and illogical "rationale" for its contention that the term "the ZX circuitry identified by counsel for Linear in the ITC Proceeding" needs to be re-written to cover different circuitry – circuitry *not* identified by counsel for Linear in the ITC proceeding, but which Linear contends performs one of the same functions. In particular, Linear states that "Linear employees were not allowed access" to documents at the ITC, so no one at Linear could

11

have known what was in "the ZX circuitry identified by counsel for Linear in the ITC
Proceeding." Linear OB (D.I. 108), at 9 n.8. This "rationale," however, totally undermines
Linear's breach of contract claim.

If the phrase "the ZX circuitry identified by counsel for Linear in the ITC Proceeding"
had not been intelligible to Linear, *it would not be in the Settlement Agreement*. Linear would
have had every incentive to negotiate with MPS to agree upon language that both parties could
understand. If the parties' agreement had been that MPS would not make products with
"circuitry based on a reverse current comparator," that language would be in the Settlement
Agreement. It is not – because that is not the parties' agreement.

If Linear did not understand the term "the ZX circuitry identified by counsel for Linear in
the ITC Proceeding" or thought that the term was unworkable because no one at Linear had
access to the materials from the ITC proceeding, it had the obligation to inform MPS of that and
see if the parties could reach a different agreement – one that contained different language.
Linear could not remain silent on this issue only to later ask this Court to re-write the Settlement
Agreement more to its liking. "Although the intent of the parties determines the meaning of the
contract (Civ. Code, § 1636, 1638), the relevant intent is 'objective' – that is, the objective intent
as evidenced by the words of the instrument, not a party's subjective intent." *Shaw v. Regents of
University of California*, 67 Cal. Rptr. 2d 850, 856, 58 Cal. App. 4th 44, 54-55 (1997).

### D. Linear Cannot Re-Write The Settlement Agreement To Cover Infringement Generally

Since the MP1543 does not contain "the ZX circuitry identified by counsel for Linear in
the ITC Proceeding," and since the Settlement Agreement cannot be re-written to refer to
"reverse current comparators" or different circuitry "that allows the product to go into sleep
mode," Linear advocates yet another re-write of the Settlement Agreement. In particular, Linear
argues that the Settlement Agreement must apply as a matter of law to any product that Linear
chooses to allege may be infringing its patents, regardless of the presence or absence of the ZX
circuitry. This argument, like the others, is unavailing for several reasons.

First, as a matter of plain English grammar, the phrase "otherwise practice the Asserted Claims" is explicitly connected to, and modified by, the phrase "any other products in which the ZX circuitry identified by counsel for Linear in the ITC Proceeding is connected so as to . . .."[6] The expressions "sleep mode" and "reverse polarity protection" are examples of ways that the ZX circuitry could operate so as to "practice the Asserted Claims." The phrase "or otherwise practice the Asserted Claims" is a catchall to capture any other potential way that the "identified" ZX circuitry might operate to practice the Asserted Claims that did not fit neatly within the labels "sleep mode" or "reverse polarity protection."

Second, Linear's argument is wrong because it would render superfluous virtually all of section 3.3 of the Settlement Agreement, thus violating basic tenets of contract interpretation. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"); *City of Atascadero*, 80 Cal. Rptr. 2d at 350, 68 Cal. App. 4th at 473 (1998) (same); *Ticor Title Ins. Co.*, 223 Cal. Rptr. at 177, 177 Cal. App. 3d at 730 ("An interpretation which renders part of an instrument to be surplusage should be avoided").

Linear's proposed construction impermissibly would render virtually all of section 3.3 to be surplusage. There would have been no point to identifying the MP1556 product, the MP1557 through MP1559 products under development, or calling out "the ZX circuitry identified by counsel for Linear in the ITC Proceeding." There also would have been no point to specifying

---

[6] The entirety of section 3.3 reads as follows:

> MPS agrees that it has not made and will not make any sales of its MP1557-1559 products anywhere in the world. MPS further agrees that, except with respect to the Licensed Product, it has not made and will not make any sales of any other products in which the ZX circuitry identified by counsel for Linear in the ITC Proceeding is connected so as to allow such products to enter into what Linear referred to as "sleep mode," "reverse polarity protection", or otherwise practice the Asserted Claims anywhere in the world. For avoidance of doubt, Linear agrees that the MPS products, such as the MP2104, that have the accused ZX circuitry disabled as set forth in the ITC proceeding, do not infringe the Licensed Patents and that MPS may continue to make, have made, use, sell and offer to sell such products.

that "MPS products . . . that have the accused ZX circuitry disabled . . . do not infringe the

Licensed Patents." Settlement Agreement (Ex. 3 to Linear OB (D.I. 109); Ex. A to MPS OB

(D.I. 106)), § 3.3. This provision immediately follows the sentence that includes the phrase

"otherwise practice the Asserted Claims," which further demonstrates that the purpose and intent

of the Settlement Agreement was to address "the accused ZX circuitry," not all possibilities of

alleged patent infringement. Indeed, if Linear's argument were correct, the entirety of

section 3.3 – which contains 143 words – could have been written in eight words: "MPS agrees

not to infringe the Asserted Claims."

Third, Linear's argument is wrong because it ignores and is inconsistent with the

language of section 6.1, which specifies that in the event of a breach of the Settlement

Agreement,



Thus, Linear's creative "interpretation" would require the Court to ignore plain English

grammar, violate basic tenets of contract interpretation, re-write section 3.3 in such a way as to

render virtually all of it surplusage and ignore the provision in section 6.1 that specifies

. Linear's argument is untenable.

Linear's argument, moreover, makes no sense on a practical level. A purpose of the

Settlement Agreement was to specify the activities that MPS agreed not to perform. MPS and

Linear entered into the Settlement Agreement before there had been any order construing the

terms of the patent claims. It would have made no sense for MPS to enter into an unbounded

agreement not to practice the Asserted Claims, as such an agreement would not have provided

guidance to MPS as to what activities were proscribed.



Tellingly, Linear's brief is devoid of any analysis discussing the actual terms of the

contract and the context of the surrounding provisions, which Linear concedes must govern.

*See Cook Inc. v. Medtronic, Inc.*, No. C 06-00333 JSW, 2006 U.S. Dist. LEXIS 47073, at *14

(N.D. Cal. June 29, 2006) (cited in Linear OB (D.I. 108), at 11) ("The Court infers the parties'

intent from the language of the Settlement Agreement and focuses 'on the usual and ordinary

meaning of the language and the circumstances under which the agreement was made.'")

(internal citations omitted); *City of Atascadero* (cited in Linear OB (D.I. 108), at 8), 80 Cal.

Rptr. 2d at 348, 68 Cal. App. 4th at 473 ("Any contract must be construed as a whole, with the

various individual provisions interpreted together so as to give effect to all, if reasonably

possible or practicable.").

Linear does not point to the words and structure of the Settlement Agreement in support

of its argument, because to actually read the Settlement Agreement is fatal to its position. This is

a point made by Linear's own legal citations. In *Cook*, for example, the court rejected Cook's

attempt to broaden a contractual provision to cover Medtronic's entire patent portfolio (instead

of patents that came as a result of acquisitions) because there was "no language" anywhere in the

contract that supported such a broad and unlimited interpretation. *Cook Inc.*, 2006 U.S. Dist.

LEXIS 47073, at *21-*22. The court noted that if it were to accept Cook's broad reading of the

15

otherwise clear language, it would "render the language regarding the acquisition of AneuRx and World Medical superfluous. This interpretation is not warranted." *Id.*[7]

Cook's argument is indistinguishable from Linear's current position. Like Cook, Linear seeks to take the plain language of a Settlement Agreement and expand the scope of its provisions beyond its written purpose. But it is the "outward expression of the agreement, rather than a party's unexpressed intention," which this Court must enforce. *Winet v. Price*, 6 Cal. Rptr. 2d 554, 558, 4 Cal. App. 4th 1159, 1166 (1992) (excluding parol evidence because contract was not ambiguous and extrinsic evidence was not in conflict). The Settlement Agreement was intended to settle a matter before the ITC concerning the MP1556-1559 products and any other product that included ***the identified ZX circuitry connected so as to*** (a) enter into "sleep mode," (b) enter into "reverse polarity protection," or (c) otherwise practice the Asserted Claims. Nothing more and nothing less. Linear cannot reasonably argue otherwise.

### E.    Linear's Attempt To Use Extrinsic Evidence To Contradict The Plain Meaning Of The Settlement Agreement Is Improper And Unavailing

#### 1.    Extrinsic Evidence May Not Be Used To Contradict The Plain Language Of A Contract

Linear devotes the bulk of its brief to extrinsic evidence that Linear contends supports its position. However, Linear's arguments run afoul of its own legal citations as well as the extrinsic evidence itself. Indeed, the cases cited by Linear permit the consideration of extrinsic

---

[7] Linear's citation to *City of Atascadero* also supports MPS's plain reading of the contract. In *City of Atascadero*, the court undertook the same contextual analysis of the contract at issue so as to reject a party's tortured interpretation. At issue was a phrase related to a party's power to "assert any claims against any third parties alleged to be owned by or held in any trust which is alleged to be applicable to the deposits of the Settling Option B Pool Participants with the Pools." Merrill Lynch argued that the phrase "alleged to be owned" referred to "any claims" as opposed to "third parties." The court rejected this argument based on principles of grammar and common sense. "As written, the lengthy subordinate clause 'alleged to be owned by or held in any trust,' etc., most logically refers to and modifies the immediately preceding phrase 'any third parties,' and not the earlier phrase 'any claims.'" *City of Atascadero*, 80 Cal. Rptr. 2d at 349, 68 Cal. App. 4th at 474. And it noted that even if Merrill Lynch's clumsy interpretation were possible, the clause had to be construed "in light of the *immediately preceding* sentence," which, when read together, made such a reading impossible. *Id.* (emphasis in original). Linear, like Merrill Lynch, "seriously misinterpret[s] the provision[s]" at issue here. *Id.*

evidence only when the language of the agreement in question is "reasonably susceptible" to the proffered interpretation. *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644, 69 Cal. 2d 33, 37 (1968). *See also Shaw*, 67 Cal. Rptr. 2d at 855, 58 Cal. App. 4th at 53 ("Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further."); *In re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002) ("In order to prevent the rule from being eviscerated by the exception the contract must be ambiguous and reasonably susceptible to the proffered meaning before parol evidence is permitted.").

In other words, the law does not permit a court to use extrinsic evidence to alter the meaning of a contract unless such evidence establishes a ***reasonable*** interpretation of the language in question. This precise point was made in *Foad Consulting Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821 (9th Cir. 2001), another case cited by Linear. In *Foad*, the court noted that extrinsic evidence was admissible under California law, but rejected Foad's attempt to proffer two pieces of extrinsic evidence. The court held that the first piece, a legend that appeared on a map, was irrelevant because it did "not divulge a latent ambiguity in the contract" and did not call into question "the parties' intent, as manifested by the contract." *Id.* at 829. The second piece, a declaration from an alleged architectural expert, was also deemed irrelevant because it did "not affect" the court's interpretation of the contract. *Id.* at 830 n.16. The same is true with Linear's extrinsic evidence.

### 2.    The Extrinsic Evidence Cited By Linear Cannot Alter The Plain Language Of The Settlement Agreement

Linear's evidence that supposedly supports its argument that the plain words of the Settlement Agreement mean something different than what they actually say consists of ███████ █████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

---

8 █████████████████████████████████████████████████████████████████
███████████



Linear, of course, fails to cite or even acknowledge this testimony. But Linear's failure to do so cannot change the plain words thereof, the plain words of the contemporaneous e-mails sent by Mr. Neely, or the plain words of the Settlement Agreement itself.[10] In short, the Settlement Agreement is very clear. It applies to preclude MPS from selling the MP1556, the MP1557-1559, and any other product that includes the very specific "ZX circuitry identified by counsel for Linear in the ITC Proceeding," where that ZX circuitry is connected so as to (a) enter into "sleep mode," (b) enter into "reverse polarity protection," or (c) otherwise practice the Asserted Claims. Nothing more, nothing less.

### 3. The Actual Extrinsic Evidence – Ignored By Linear – Supports MPS's Position And The Plain Language Of The Settlement Agreement

If this Court were to consider extrinsic evidence in interpreting the Settlement Agreement, it would find that the extrinsic evidence supports MPS's position.

---

[9] Rule 30(e) expressly provides that a party can make changes "in form or substance." Fed. R. Civ. P. 30(e). The clarification made by Mr. Neely was proper as it was entirely consistent with his other testimony (not to mention the contemporaneous documents and the Settlement Agreement itself), and did not alter his testimony or introduce any new theories or defenses into the case. *See, e.g.*, *Titanium Metals Corp. v. Elkem Mgmt., Inc.*, 191 F.R.D. 468, 472 (W.D. Penn. 1998) (*citing* 8A Charles A. Wright *et al.*, *Federal Practice & Procedure* § 2118, at 134 (1994). *Donald M. Durkin Contr., Inc. v. City of Newark*, C.A. No. 04-163 GMS, 2006 U.S. Dist. LEXIS 68221, *15-*16 (D. Del. Sept. 22, 2006) is not to the contrary, as it holds only that an errata sheet that posited "alternative theories and defenses" from the ones raised at the deposition were improper.

[10] The remainder of Linear's "evidence" consists of self-serving testimony from John England, Linear's in-house counsel, and testimony from MPS's CEO, Michael Hsing, which, like that of Mr. Neely, is taken out of context and does nothing to contradict the intention of the agreement itself as reflected in its actual language. As such, Linear's assertions must be disregarded. *Foad Consulting Group*, 270 F.3d at 829.



Extrinsic evidence cannot be used to contradict the plain language of a contract.  In this case, the terms of the Settlement Agreement are clear-cut.  Furthermore, not only are Linear's attempts to re-write the Settlement Agreement improper, the extrinsic evidence supports MPS as to the plain meaning of the parties' agreement.  Linear's position is without merit.

**F.     MPS May Properly Challenge The Validity And Enforceability Of The Patents-In-Suit**

Linear's final argument relates to the question of whether section 2.5 of the Settlement Agreement precludes MPS from challenging the validity of the patents-in-suit in this action.

Section 2.5 of the Settlement Agreement reads as follows:

> MPS agrees that, in any proceeding to enforce the Consent Order or this Agreement, MPS will not challenge or otherwise contest the validity of the Patents-in-Suit.

Linear dedicates approximately three pages of its opening brief to this clause and its purported scope. Yet the critical issue – whether or not section 2.5 even applies, *i.e.*, is this current litigation really a "proceeding to enforce the Consent Order or this [Settlement] Agreement" – is relegated to a one sentence pronouncement: "There is no question that this is an action to enforce the Settlement Agreement." Linear OB (D.I. 108), at 10.

Linear's attempt to dispose of this with a one sentence *ipse dixit* reflects its overwhelming desire to have this Court extend the Settlement Agreement far beyond its intended boundaries. Linear contends that if it alleges infringement against any product, it is entitled to preclude an attack on validity. This is preposterous and directly contrary to what Linear said about this exact issue during the negotiations leading up to the execution of the Settlement Agreement.

The passage from Mr. Neely's September 26, 2005 e-mail quoted above was specifically directed at section 2.5 of the Settlement Agreement. In particular, with respect to section 2.5, MPS revised the language that Linear had drafted and sent it back to Linear. In the accompanying e-mail, Mr. Neely stated:



Ex. 9 to Linear OB (D.I. 109) (emphasis added).

With regard to that specific statement, Mr. England responded, "



Linear's citation to *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001) is unavailing. *Flex-Foot* was based on the specific provisions of the settlement agreement at issue in that case, which read as follows:

> 7.1 The CRP Group agrees not to challenge or cause to be challenged, directly or indirectly the validity *or enforceability* of the '913 patent and/or the '363 patent in *any court or other tribunal*, including the United States Patent and Trademark Office. As to the '363 and '913 patents only, the CRP Group waives *any* and *all* invalidity and *unenforceability* defenses in *any* future litigation, arbitration, or other proceeding.[11]

*Id.* at 1364 (emphasis added).

As is apparent, the settlement agreement at issue in *Flex-Foot* **explicitly** denied CRP the right to challenge validity, unenforceability and scope of the patents, in *any court or tribunal*. *Id.* at 1370. In contrast, the Settlement Agreement before this Court contains *no such words,* and instead limits challenges *only* in connection with proceedings to enforce the Settlement Agreement itself (*i.e.,* where MPS sold an MP1556-1559 or other product with "the ZX circuitry identified by counsel for Linear in the ITC Proceeding" connected to as to perform one of the prohibited functions), and only limits MPS's arguments *related to validity*. *Flex-Foot* affirms that it is the *plain words* of the agreement which govern – and nothing else. Thus, because this case does not involve the sale by MPS of the MP1556-1559 or any other product even containing the specified ZX circuitry, much less having the ZX circuitry connected so as to perform one of

---

[11] A corresponding license agreement waived CRP's ability to challenge validity, unenforceability *or scope* of the '913 and '363 patents as well. *Id.*

the covered functions, MPS cannot be precluded from challenging the validity of Linear's patents.

### 1.    Linear Cannot Re-Write The Settlement Agreement To Turn "Validity" Into "Validity and Enforceability"

As set forth above, there is no merit in Linear 's attempt to convert the Settlement Agreement into an unbounded waiver by MPS of its invalidity defenses. Linear's brief, however, does not stop there. In particular, Linear argues that the term "validity of the Patents-in-Suit" in section 2.5 of the Settlement Agreement does not mean "validity," it really means "validity and enforceability." Linear OB (D.I. 108), at 10-11. Once again, Linear's position is without merit.

As noted above, section 2.5 reads as follows:

> MPS agrees that, in any proceeding to enforce the Consent Order or this Agreement, MPS will not challenge or otherwise contest the validity of the Patents-in-Suit.

There is a fundamental and clear-cut distinction between the validity of a patent claim and the enforceability of a patent. "Inequitable conduct is a separate defense to patent infringement." *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1312 (Fed. Cir. 1988). If a patent applicant engages in inequitable conduct during the prosecution of a patent application, the resulting patent is unenforceable, it is not invalid. *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1329 (Fed. Cir. 2004) ("[m]isleading statements by patent applicants . . . can produce unenforceability, not invalidity"). *See also Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1569 (Fed. Cir. 1992) ("we note that proving inequitable conduct does not 'invalidate' a patent. Rather, it renders the patent unenforceable."). Thus, even if the Settlement Agreement were construed improperly to preclude MPS from challenging the validity of the patents-in-suit regardless of the nature of the allegedly infringing product, MPS would be free to challenge the enforceability of those patents.

On this point as well, Linear asks the Court to ignore the language of the Settlement Agreement. Linear's "rationale" is that since California Civil Code section 1641 states that

contracts should be construed so as not to render any language redundant, the language "or otherwise contest the validity" in section 2.5 must mean something besides "challenge . . . the validity." Through mystical "canons of contract interpretation" that it never explains, Linear argues that what this must mean is that MPS somehow is precluded from challenging the enforceability of the patents-in-suit. Linear's argument is devoid of merit.

Section 2.5 does not mention enforceability of the patents-in-suit *at all*. Nor does it mention inequitable conduct or patent misuse. It would be wholly improper to somehow interpret contact language to govern a subject that is nowhere mentioned in the contract. "[T]he Judge is . . . not to insert what has been omitted, or to omit what has been inserted." Cal. Code of Civ. Pro. § 1858 (West 2007). Linear, once again, is asking the Court to rewrite the express language of the Settlement Agreement. Linear's request should be denied.

### 2. Linear Is Asserting Patent Claims In This Action That Were Not Asserted In The ITC Proceeding

There is yet another defect in Linear's attempts to re-write the Settlement Agreement. The relevant provisions of the Settlement Agreement (e.g., sections 3.3 and 6.1) only concern the "Asserted Claims." Linear's brief ignores the fact that three of the claims it is asserting in this case – claims 1, 3 and 34 of U.S. Patent No. 6,580,258 – are not included in the Asserted Claims identified in section 1.3 of the Settlement Agreement. Clearly the Settlement Agreement could not cover those claims. Once again, Linear has ignored the plain language of the parties' agreement in an effort to achieve an improper result.

## V.    CONCLUSION

For the foregoing reasons, MPS respectfully requests that Linear's motion be denied. As set forth herein and in MPS's own Motion for Summary Judgment of No Breach of Contract (Count One), the Court should dismiss Linear's breach of contract claim.

OF COUNSEL:

Dean G. Dunlavey
Mark D. Kachner
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Tel: (714) 540-1235

Mark A. Flagel
Robert Steinberg
Sean S. Pak
Latham & Watkins
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Tel: (213) 485-1234

David McKone
Latham & Watkins LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Tel: 312-777-7316

Dated: December 12, 2007
Public Version Dated: December 19, 2007
838634 / 30611

POTTER ANDERSON & CORROON LLP

By:    _/s/ Kenneth L. Dorsney_
       Richard L. Horwitz (#2246)
       Kenneth L. Dorsney (#3726)
       Hercules Plaza, 6th Floor
       1313 North Market Street
       Wilmington, Delaware 19889-0951
       Tel: (302) 984-6000
       rhorwitz@potteranderson.com
       kdorsney@potteranderson.com

_Attorneys for Defendant_
_Monolithic Power Systems, Inc._

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on December 19, 2007, the attached document

was electronically filed with the Clerk of the Court using CM/ECF which will send notification

to the registered attorney(s) of record that the document has been filed and is available for

viewing and downloading.

I further certify that on December 19, 2007, I have Electronically Mailed the document to

the following person(s):

Karen Jacobs Louden
Morris, Nichols, Arsht & Tunnell, LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899
klouden@mnat.com

Raphael V. Lupo
Mark G. Davis
Ronald J. Pabis
Stephen K. Shahida
Joel M. Freed
Natalia V. Blinkova
Matthew G. Cunningham
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005
rlupo@mwe.com
madavis@mwe.com
rpabis@mwe.com
sshahida@mwe.com
jfreed@mwe.com
nblinkova@mwe.com
mcunningham@mwe.com

Jimmy Shin
McDermott Will & Emery LLP
3150 Porter Dr.
Palo Alto, CA  94304-1212
jshin@mwe.com

By: */s/ Kenneth L. Dorsney*
    Richard L. Horwitz
    Kenneth L. Dorsney
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, Delaware 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    kdorsney@potteranderson.com

750219

# EXHIBIT E

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT F

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT G

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY