IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LINEAR TECHNOLOGY CORPORATION | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) C.A. No. 06-476 GMS |
| v. | ) <br> ) |
| MONOLITHIC POWER SYSTEMS, INC., | ) <br> ) |
| Defendant. | ) <br> ) |

**MEMORANDUM**

**I.    INTRODUCTION**

On August 3, 2006, Linear Technology Corporation ("Linear") filed the above-captioned action against Monolithic Power Systems, Inc. ("MPS") alleging infringement of U.S. Patent Numbers 5,481,178 (the '178 patent) and 6,580,258 (the '258 patent) (collectively, the "patents-in-suit") and breach of Settlement Agreement. Presently before the court are the parties cross-motions for summary judgment on the claim for breach of the Settlement Agreement. For the reasons that follow, the court will deny both motions. The court also will interpret certain sections of the Settlement Agreement.

**II.    PROCEDURAL BACKGROUND**

In August 2004, Linear filed a complaint with the International Trade Commission (the "ITC"), who initiated an investigation of MPS' activities under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. Linear alleged that MPS violated section 337 by importing voltage regulator circuits that infringed the patents-in-suit. Linear specifically accused MPS' MP1556 and MP1557-1559 voltage regulator circuit products of infringing the patents-in-suit. MPS

challenged the patents as invalid and unenforceable due to inequitable conduct.

The action proceeded and, on the eve of trial, the parties agreed to resolve their dispute by entering into a Settlement Agreement and a Consent Order Stipulation. The parties exchanged several drafts of the Settlement Agreement during negotiations and signed the final Settlement Agreement on September 29, 2005.

In 2006, MPS began marketing a voltage regulator controller product designated MP1543. Linear then brought the current action alleging breach of the Settlement Agreement and infringement of the patents-in-suit.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 392 (3d Cir. 1998). Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle*, 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id*. (citing *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 247-248 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id*. In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id*.; *see also Assaf v. Fields*, 178 F.3d 170, 173-74 (3d Cir. 1999). If the moving party has demonstrated an absence of material fact, the non-moving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986) (quoting Federal Rule of Civil Procedure 56(e)).  The mere existence of some evidence in support of the non-moving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the non-moving party on that issue.  *Anderson*, 477 U.S. at 249.

## IV.  DISCUSSION

### A.  The Court's Interpretation of the Settlement Agreement

Linear and MPS each ask the court to determine that its respective interpretation of the Settlement Agreement is correct.  Specifically, the parties offer competing interpretations of two sections of the Settlement Agreement, sections 2.5 and 3.3.  Section 2.5 states:

> MPS agrees that, in any proceeding to enforce the Consent Order or this Agreement, MPS will not challenge or otherwise contest the validity of the Patents-in-Suit [the '178 and '258 patents].

(D.I. 109 Ex. 3, at 3.)  Section 3.3 of the Settlement Agreement states:

> MPS agrees that it has not made and will not make any sales of its MP 1557-1559 products anywhere in the world.  MPS further agrees that, except with respect to the Licensed Product [the MP1556], it has not made and will not make any sales of any other products in which the ZX circuitry identified by counsel for Linear in the ITC Proceeding is connected so as to allow such products to enter into what Linear referred to as "sleep mode," "reverse polarity protection," or otherwise practice the Asserted Claims[1] anywhere in the world.  For avoidance of doubt, Linear agrees that the MPS products, such as the MP2104, that have the accused ZX circuitry disabled as set forth in the ITC proceeding, do not infringe the Licensed Patents and that MPS may continue to make, have made, use, sell and offer to sell such products.

(Id. at 4.)

---

[1] The "Asserted Claims" are defined in section 1.3 of the Settlement Agreement as claims 1, 31, 34, 41, 44, 55, and 56 of the '178 patent and claims 2 and 35 of the '258 patent.  (D.I. 109 Ex. 3, at 2.)

3

Linear contends that section 2.5 should be interpreted as a bar to any MPS challenge of the validity and/or enforceability of the patents-in-suit in any action brought pursuant to the Settlement Agreement. According to Linear, because the present action involves a claim for breach of the Settlement Agreement, it is a proceeding to enforce that agreement and MPS, therefore, cannot challenge the validity and/or enforceability of the patents-in-suit. Linear further argues that the proper interpretation of section 3.3 is one which holds that MPS agreed not to practice any of the asserted claims of the patents-in-suit anywhere in the world. In making its latter argument, Linear resorts to extrinsic evidence, that is, the parties' negotiations and communications, including emails, during the course of drafting the Settlement Agreement. Linear argues that the extrinsic evidence supports its position that MPS agreed never to practice the asserted claims of the patents-in-suit anywhere in the world.

Conversely, MPS asserts that section 2.5 of the Settlement Agreement does nothing to prevent it from contesting the validity of the patents-in-suit in this action. MPS also argues that even if the court concludes that section 2.5 prevents it from contesting the validity of the patents-in-suit, it does not even mention the word "enforceability," and should not be interpreted to include that term. Finally, MPS asserts that, consistent with Linear's infringement contentions in the ITC proceeding, the court should interpret the Settlement Agreement to address only three categories of products: (1) the MP1556, (2) the MP1557-MP1559 products under development, and (3) "any other products in which the ZX circuitry identified by counsel for Linear in the ITC Proceeding is connected so as to allow such products to enter into what Linear referred to as 'sleep mode,' 'reverse polarity protection,' or otherwise practice the Asserted Claims anywhere in the world." (D.I. 106, at 3-4.) In other words, MPS argues that the phrase "or otherwise practice the Asserted Claims

anywhere in the world" refers to only those MPS products that have the ZX circuitry identified by Linear's counsel during the ITC proceeding, while Linear argues that the phrase refers to any MPS product that practices any of the Asserted Claims.

The Settlement Agreement contains a choice of law provision, which provides that California law will govern disputes arising under the agreement. (See D.I. 109 Ex. 3, at 6.) Under California law, the interpretation of a contract is a question of law. *In re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002). The fundamental goal of contract interpretation is to ascertain the mutual intent of the parties. Cal. Civ. Code § 1636; *Bank of the West v. Superior Court*, 833 P.2d 545, 552 (1992). The court must view the language of the contract as a whole and, to the extent possible, give effect to every provision. *Ticor Title Ins. Co. v. Rancho Santa Fe Assoc.*, 177 Cal. App. 3d 726, 730 (1986); *see* Cal. Civ. Code § 1641. An interpretation which renders part of the contract surplusage should be avoided. *Ticor*, 177 Cal. App. 3d at 730. Where a contract is clear and explicit on its face and does not lead to absurd results, the court ascertains the parties' intent from the written terms included in the agreement and goes no further. *Ticor Title Ins. Co. v. Employers Ins. of Wausau*, 40 Cal. App. 4th 1699, 1707 (1995); Cal. Civ. Code § 1638. The parol evidence rule does not bar extrinsic evidence to interpret the meaning of express contract terms. However, parol evidence is only permitted where the contractual term is ambiguous and susceptible to more than one meaning. *See Bennett*, 298 F.3d at 1064; *Cook Inc. v. Medtronic, Inc.*, No. C 06-00333 JSW, 2006 U.S. Dist. LEXIS 47073, at * 14 (N.D. Cal. June 29, 2006); *but see Foad Consulting Gr., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 826 (9th Cir. 2001) ("In contrast to many other states, California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of

the terms of a contract even then the meaning appears unambiguous.")[2]

After having reviewed the Settlement Agreement and, specifically sections 2.5 and 3.3, the court concludes that they are clear, unambiguous, and not reasonably susceptible to more than one meaning. The court now turns to the proper interpretation of sections 2.5 and 3.3 of the Settlement Agreement.

    1.    Section 2.5

As previously mentioned, section 2.5 of the Settlement Agreement pertains to MPS' ability to contest Linear's rights to the patents-in-suit. Linear argues that section 2.5 bars MPS from asserting any invalidity and/or enforceability defenses in this action, while MPS asserts that it may challenge the validity and enforceability of the patents-in-suit.[3] The court is persuaded, in part, by both parties' arguments. More particularly, the court is persuaded that Linear's interpretation regarding MPS' ability to contest the validity of the patents-in-suit is correct, and the MPS' interpretation regarding enforceability is correct. Section 2.5 specifically prevents MPS from challenging or otherwise contesting the validity of the patents-in-suit in any proceeding to enforce the Settlement Agreement. Assuming for purposes of contract interpretation only that Linear has

---

[2] Here, Linear urges the court to look to extrinsic evidence to ascertain the parties' intent in drafting the Settlement Agreement, specifically section 3.3. MPS also refers the court to extrinsic evidence, when discussing its interpretation of section 2.5 of the Settlement Agreement. The court finds, however, that the provisions of the Settlement Agreement at issue are not reasonably susceptible to more than one meaning. Thus, it is improper to resort to parol evidence here to determine the parties' intent. In addition, resort to extrinsic evidence in this case creates ambiguity where there is none in the Settlement Agreement, which is clear on its face. Accordingly, the court declines both parties' invitations to use the proffered extrinsic evidence as an interpretive aid.

[3] MPS also argues throughout its brief that this action is not one arising out of the Settlement Agreement, because its MP1543 product is not covered by the agreement. The court will address this argument after it interprets the language of sections 2.5 and 3.3.

brought this proceeding to enforce the Settlement Agreement, a contention with which MPS disagrees, the language is clear on its face that MPS will not contest the validity of the patents-in-suit. Indeed, MPS has not argued, nor can it argue, that it can challenge the validity of the patents-in-suit if the court determines that this is an action to enforce the Settlement Agreement. Rather, it invokes a cart before the horse argument, contending that this action is not a proceeding to enforce the Settlement Agreement, because the ZX circuitry identified by counsel for Linear in the ITC proceeding is absent from its accused MP1543 product. While MPS ultimately may be correct that the MP1543 does not contain the ZX circuitry and this is not an action to enforce the Settlement Agreement, this fact has nothing to do with contract interpretation. The express words of the Settlement Agreement thus bar MPS from challenging the validity of the patents-in-suit, if the court determines that this action is one to enforce that agreement.

The court agrees with MPS, however, that nowhere in the Settlement Agreement did it bargain away its right to challenge the enforceability of the patents-in-suit. The word "enforceability" does not appear in the Settlement Agreement. If Linear intended to prohibit MPS from challenging the enforceability of the patents-in-suit, it should have included language to that effect in section 2.5 of the Settlement Agreement. A party's intention not expressed in the language of the contract fails to become part of the contract, and is irrelevant to the interpretation of the contract. *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003). Here, Linear attempts, after the fact, to rewrite the Settlement Agreement to expand its coverage to enforceability. Linear argues that the court must incorporate the term "enforceability" into the Settlement Agreement, because to fail to do so would render the terms "challenge" and "otherwise contest" of section 2.5 redundant. The court is not

persuaded and finds that the words "challenge or otherwise contest" modify the term validity – the only MPS affirmative defense to the patents-in-suit expressed in the Settlement Agreement. If the parties' intent was to prevent MPS from challenging the enforceability of the patents-in-suit, the contract would expressly contain language to that effect, just as it contains language regarding "validity." Therefore, the court rejects Linear's interpretation of the Settlement Agreement, which would bar MPS from challenging the enforceability of the patents-in-suit.

    2.    Section 3.3

As previously discussed, section 3.3 of the Settlement Agreement addresses infringement and the agreements MPS made with respect to certain products. As with section 2.5, the language of section 3.3 is clear on its face and not susceptible to multiple meanings. The parties' disagreement over the interpretation of section 3.3 centers around one sentence of that paragraph: "MPS further agrees that, except with respect to the Licensed Product [the MP1556], it has not made and will not make any sales of any other products in which the ZX circuitry identified by counsel for Linear in the ITC Proceeding is connected so as to allow such products to enter into what Linear referred to as "sleep mode," "reverse polarity protection," or otherwise practice the Asserted Claims anywhere in the world." Even further distilled, the parties' dispute is whether the clause "or otherwise practice the Asserted Claims anywhere in the world" is a stand alone clause – Linear's position – or modifies the other language of the sentence, specifically the language regarding the ZX circuitry identified by counsel for Linear in the ITC proceeding – MPS' position.

After having read the language of the section 3.3, which contains no ambiguity, and the entire Settlement Agreement, the court is persuaded by MPS' position. That is, the court agrees with MPS that the purpose and intent of the Settlement Agreement was to address "the accused ZX

circuitry" and MPS products containing such circuitry, not each and every one of Linear's potential infringement allegations regarding the patents-in-suit. The language of section 3.3 is specific and narrowly drawn, so as to preclude MPS from making any sales of products "in which the ZX circuitry identified by counsel for Linear in the ITC Proceeding is connected so as to allow such products to enter into . . . [(1)] 'sleep mode,' [(2)] 'reverse polarity protection,' or [(3)] otherwise practice the Asserted Claims anywhere in the world." (D.I. 109 Ex. 3, at 4.)[4] Accordingly, in order for MPS to be in breach of the Settlement Agreement, its MP1543 product must contain the ZX circuitry identified by counsel for Linear in the ITC proceeding connected such that it (1) allows the product to inter into "sleep mode;" (2) allows the product to enter into "reverse polarity protection;" *or* (3) allows the product to otherwise practice the Asserted Claims.[5]

---

[4] Linear now appears to argue that the phrase "the ZX circuitry identified by counsel for Linear in the ITC Proceeding," is unclear, because its counsel did not know what the ZX circuitry was since it had not seen the schematics. The court finds this argument without merit. If Linear thought that the phrase was unclear, Linear should have made that known during the negotiations, and negotiated for different language to be used in the Settlement Agreement, or defined the term in section 1 of the agreement. It is very easy and often tempting for the court to play Monday morning quarterback and adopt an interpretation based on hindsight, or what it believes the parties knew at the time the contract was signed. This court, however, is not willing to adopt such an approach in interpreting an arms length agreement that is clear on its face and unambiguous.

[5] Section 6.1 of the Settlement Agreement, which includes liquidated and royalty damages for breach, further supports the court's conclusion. Section 6.1 states, in pertinent part: "Additionally, in an action to enforce this Agreement, the royalty rate of forty percent (40%) shall apply to any sales of (i) Licenced Product sold after the Expiration Date, or (ii) the MP1557-1559, or other products including the accused ZX circuitry identified by counsel for Linear in the ITC proceeding connected so as to allow products to practice the Asserted Claims, sold after the Effective Date." (D.I. 109 Ex. 3, at 6.) Thus, section 6.1 covers the same products as section 3.3.

### B.     Whether MPS has Breached the Settlement Agreement

Having construed sections 2.5 and 3.3 of the Settlement Agreement, the court now turns to the parties' arguments regarding MPS' alleged breach of the Settlement Agreement. MPS argues that its MP1543 product falls outside the scope of conduct covered by the Settlement Agreement, because it does not contain the ZX circuitry identified by counsel for Linear during the ITC proceeding. MPS further argues that because its MP1543 product does not fall under the provisions of the Settlement Agreement, this action is not an action to enforce that agreement. Linear, in contrast, asserts that, although the circuitry in the MP1543 is not labeled as "ZX circuitry," it performs the same function as the ZX circuitry in the MP1556 and, therefore, contains the same circuitry at issue in the ITC proceeding. Linear further asserts that there is "no question that this is an action to enforce the Settlement Agreement." (D.I. 108, at 10.)

After having considered the parties arguments and supporting evidence, the court concludes that genuine issues of material fact remain regarding whether the MP1543 product contains the ZX circuitry identified by counsel for Linear in the ITC proceeding, preventing the entry of summary judgment for either party on the breach of contract claim. Although a close question, the court's conclusion is supported by the parties' experts' opinions, which – not surprisingly – are diametrically opposed. Specifically, Linear's expert, Robert Blauschild, opines that the MP1543 comparator performs the same function as the ZX circuitry even though it is not labeled as such. (See D.I. 109 Ex. 13, at 35-36, 48-49.) On the other hand, MPS' expert, Dr. Thomas Szepsei, opines that the MP1543 product does not contain the circuitry in the MP1556 that Linear's counsel identified in the ITC Proceeding as comprising the "third circuit." (D.I. 106 Ex. D, at 84-86.) Thus, there appears to be a classic battle of the experts on the issue of whether the MP1543 product

contains the ZX circuitry identified by counsel for Linear in the ITC proceeding. As a result, the court will deny both parties' motions for summary judgment on breach of the Settlement Agreement.

In addition, intertwined with the ZX circuitry issue is the question of whether this action is one to enforce the Settlement Agreement. While Linear claims that there is "no question" that this action is one to enforce the Settlement Agreement, its only support for that claim is its complaint. At this time, however, the court cannot say as a matter of law that this action is one to enforce the Settlement Agreement. If the jury's verdict is such that the MP1543 product does not contain the ZX circuitry identified by counsel for Linear in the ITC proceeding, then it follows that the MP1543 is outside the scope of the Settlement Agreement and this is not an action to enforce that agreement. Likewise, if the jury's verdict is for Linear on the issue, then it follows that the MP1543 product is within the scope of the Settlement Agreement, and this is an action to enforce that agreement. Given the foregoing, the court will determine whether this action is one to enforce the Settlement Agreement after the jury makes its findings with respect to the ZX circuitry issue. Further, the court will not preclude MPS from presenting its invalidity issues to the jury.[6]

## V.   CONCLUSION

For the aforementioned reasons, the concludes as follows: (1) the Settlement Agreement and provisions of the Settlement Agreement at issue are clear, unambiguous, and not susceptible to more than one meaning; (2) section 2.5 of the Settlement Agreement bars MPS from contesting the validity of the patents-in-suit should the jury verdict dictate that this action is one to enforce the

---

[6] Should it come to pass that the jury concludes the MP1543 product contains the ZX circuitry, then the court will hold the jury's findings with respect to validity of the patents-in-suit moot.

Settlement Agreement; (3) section 2.5 of the Settlement Agreement does not bar MPS from asserting that the patents-in-suit are unenforceable; (4) section 3.3 of the Settlement Agreement requires the MP1543 product to contain the ZX circuitry identified by counsel for Linear in the ITC proceeding connected such that it allows the product to inter into "sleep mode;" allows the product to enter into "reverse polarity protection;" or allows the product to otherwise practice the Asserted Claims; (5) genuine issues of material fact exist with regard to whether the MP1543 product contains the "ZX circuitry identified by counsel for Linear in the ITC proceeding," which preclude the entry of summary judgment for either party; (6) the court cannot determine whether this action is one to enforce the Settlement Agreement until after the jury returns a verdict on the ZX circuitry issue; and (7) the court will not preclude MPS from presenting its invalidity case to the jury.

Dated: May 23, 2008                                            /s/ Gregory M. Sleet
                                                               CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LINEAR TECHNOLOGY CORPORATION ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MONOLITHIC POWER SYSTEMS, INC., ) <br> ) <br> Defendant. ) | C.A. No. 06-476 GMS |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. MPS' Motion for Summary Judgment of No Breach of Contract (Count I) (D.I. 105) is DENIED.

2. Linear's Motion for Summary Judgment on Contract Interpretation and Breach of Contract (D.I. 107) is DENIED.

3. The Settlement Agreement and provisions of the Settlement Agreement at issue – sections 2.5 and 3.3 – are clear, unambiguous, and not susceptible to more than one meaning.

4. Section 2.5 of the Settlement Agreement bars MPS from contesting the validity of the patents-in-suit should the jury verdict dictate that this action is one to enforce the Settlement Agreement.

5. Section 2.5 of the Settlement Agreement does not bar MPS from asserting that the

patents-in-suit are unenforceable.

6. Section 3.3 of the Settlement Agreement requires the MP1543 product to contain the ZX circuitry identified by counsel for Linear in the ITC proceeding connected such that it allows the product to inter into "sleep mode;" allows the product to enter into "reverse polarity protection;" or allows the product to otherwise practice the Asserted Claims.

7. Genuine issues of material fact exist with regard to whether the MP1543 product contains the "ZX circuitry identified by counsel for Linear in the ITC proceeding," which preclude the entry of summary judgment for either party. As a result, the court cannot determine whether this action is one to enforce the Settlement Agreement until after the jury returns a verdict on the ZX circuitry issue.

8. The court will not preclude MPS from presenting its invalidity case to the jury.

9. Linear's Motion to Strike the Defendant's Affirmative Defenses of Invalidity and Unenforceability under Fed. R. Civ. P. 12(f) or, in the Alternative, for Judgment on the Pleadings under Fed. R. Civ. P. 12(c) (D.I. 11) is DENIED.

Dated: May 23, 2008                               /s. Gregory M. Sleet
                                                  CHIEF, UNITED STATES DISTRICT JUDGE