1                  IN THE UNITED STATES DISTRICT COURT

2                  IN AND FOR THE DISTRICT OF DELAWARE

3                                - - -

4    LINEAR TECHNOLOGY CORPORATION, :     Civil Action
                                    :
5         Plaintiff,               :
                                    :
6         v.                        :
                                    :
7    MONOLITHIC POWER SYSTEMS,      :
     INC.,                          :
8                                   :
          Defendant.               :     No. 06-476-GMS
9                                - - -

10                       Wilmington, Delaware
                        Friday, May 23, 2008
11                           9:55 a.m.
                            Conference
12                               - - -

13   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

14   APPEARANCES:

15            KAREN JACOBS LOUDEN, ESQ., and
              JAMES WALTER PARRETT, JR., ESQ.
16            Morris, Nichols, Arsht & Tunnell
                          -and-
17            JOEL M. FREED, ESQ.,
              MATTHEW CUNNINGHAM, ESQ., and
18            JIMMY SHIN, ESQ.
              McDermott Will & Emery LLP
19            (Washington, D.C. and Silicon Valley, CA)

20                        Counsel for Plaintiff

21

22

23

24

25

1    **APPEARANCES:**

2            RICHARD L. HORWITZ, ESQ.
             Potter Anderson & Corroon LLP
3                      -and-
             MARK A. FLAGEL, ESQ.,
4            DEAN G. DUNLAVEY, ESQ., and
             DAVID McKONE, ESQ.
5            Latham & Watkins
             (Chicago, IL)
6                      -and-
             CLAUDE M. STERN, ESQ.,
7            ALLISON E. MONAHAN, ESQ., and
             ALAN BLUM, ESQ.
8            Quinn Emanuel
             (Silicon Valley, CA and New York, N.Y.)

9
                              Counsel for Monolithic
10
                          -   -   -
11

12            THE COURT:  Good morning.

13            (Counsel respond "Good morning.")

14            THE COURT:  Counsel, this is an office

15    conference, so, please, take your seats.

16            I noticed that on the order, in the opinion just

17    issued, it is titled "Memorandum," but we have changed that.

18            Plaintiffs here?

19            MS. JACOBS LOUDEN:  Yes, Your Honor.  Hello.

20    Karen Jacobs Louden from Morris Nichols.  I am here with my

21    colleague James Parrett.  From McDermott, Will & Emery we

22    have Joel Freed, Matthew Cunningham and Jimmy Shin.

23            MR. HORWITZ:  Your Honor, Rich Horwitz from

24    Potter Anderson.  With me today from Latham & Watkins are

25    Mark Flagel and Dean Dunlavey, And from Quinn Emanuel Claude

1    Stern & Alan Blum.

2            In the second table, Allison Monahan from Quinn

3    Emanuel, and David McKone from Latham & Watkins.  And from

4    our client back behind the Court, Soria Chang.

5            THE COURT:  Good morning.

6            We are going to try to get them to turn the heat

7    off.

8            Sorry for the belated issuance of the opinion.

9    I wanted to give you a chance, I hope you have had a chance

10   to at least read it, if not digest it, at least read it and

11   to at least give it some thought.  If not, also, I don't

12   know if you had a chance to talk among yourselves, the

13   parties, that is, because obviously, the ruling is going to

14   affect significantly our discussion today.  I am certainly

15   willing to give you some additional time to do that, if you

16   think that that would be time well-spent.  I think it would

17   be, quite frankly.  But we don't have to.  But I think there

18   are some things that you can now agree on, whether you agree

19   or not, there are some things that you can now agree on,

20   given the Court's ruling.

21            What is your pleasure?

22            MR. FLAGEL:  We have had a short discussion, Mr.

23   Freed and I have had a short discussion, so I am not sure

24   that further discussion right now will be well-spent.

25   Certainly, there will be discussion after today, I assume

1    there will be, between now and four weeks from now.

2            THE COURT:  I would expect so.

3            MR. FLAGEL:  It probably makes sense to talk

4    about some of the other issues.

5            THE COURT:  Here is, then, how I would like to

6    proceed.  Typically, I will talk about or have discussions

7    with you about your motions in limine at the outset, then go

8    through the pretrial order, the proposed pretrial order.

9    There didn't seem to me to be much there that was

10   controversial.  I would give the parties an opportunity to

11   point anything out to me that I have missed in my perusal of

12   the proposed order.

13           Not necessarily in the order of agenda, we will

14   talk about preliminary instructions to some extent, because,

15   again, I think the ruling is going to impact your positions

16   on some things there.

17           I would like to offer a suggestion on the

18   preliminary instructions.  That is, rather than having me

19   read through the various parts of the patent and explain

20   that verbally, that you consider using the video in lieu of

21   those sections of the preliminary instructions.  I am always

22   willing to do it when the parties agree.  It's not always

23   the case that the parties agree on the video.  I

24   well-understand why at times a party may not want to use the

25   video.  I think it's pretty well-done.  I don't think it's

1     dated yet.  It gives, I think, a fairly objective overview

2     of the PTO and the process.

3                I know, depending upon your point of view, you

4     don't like seeing the examiner pushing around that cart

5     that's laden with work.  I know that some people feel that

6     is an editorialization that is unfortunate in the

7     production.  But it is sort of the way it is down there.  I

8     actually had examiners on my staff as externs, examiners and

9     in other ways.  So I do have a pretty good sense, though I

10    am not a member of the Patent Bar and haven't visited the

11    PTO, and I probably should do that, but I do have a pretty

12    good sense of what things are like there and how they work

13    and how they look.

14                Nevertheless, we can talk about that.

15                We can talk about the voir dire.  I don't see

16    anything controversial about the voir dire.  There are a

17    couple of questions, I think three, that might merit a

18    little bit of discussion, but not a lot.

19                I am not planning to deal with the final jury

20    instructions today.  Typically, I understand that counsel

21    don't pay a lot of attention at this stage, haven't yet had

22    a chance to really engage those issues.  I know there are

23    going to be differences of view.  Again, to some extent,

24    those instructions are going to be informed in how they

25    ultimately look at the end of the day by the Court's ruling

1    recently.

2                    Generally, we will talk about some of my nits

3    and nudges, generally, do's and don'ts.

4                    And we will open the floor for any questions or

5    items.

6                    MR. FREED:  Your Honor, I had one thought, given

7    the ruling.  That was, since the issue on validity is now

8    kind of a contingent one, whether it would make sense in

9    this case to have a phased trial with the same jury and just

10   have validity come after the jury came back with a verdict

11   on the issue of the ZX circuitry.

12                   THE COURT:  I wouldn't say that it doesn't make

13   sense.  I have thought about it.  I am not hidebound about

14   it at this point.  It's something that I am willing to talk

15   about at some point during this process.  Okay.

16                   MR. FLAGEL:  Your Honor, the one motion in

17   limine that I would like to focus on, if you would indulge

18   me for a minute, it's our Motion in limine No. 2, and it

19   relates exactly to the ZX circuit issue.  It also plugs into

20   Mr. Freed's question.

21                   Basically, Your Honor, it is our motion to

22   preclude them from arguing to the jury --

23                   THE COURT:  That is a summary judgment motion,

24   counsel, and I am not going to entertain it.  That is the

25   long and short of it.

1          Anything else before we get started ?

2          I am denying MPS's Motion in Limine No. 2, which

3   is styled -- it is docketed Item No. 142.  It is Monolithic

4   Power Systems' Motion in Limine No. 2 To Preclude Linear

5   Technology from Presenting any Evidence or making any

6   Argument that the accused MP1543 part contains the ZX

7   Circuitry Identified by Counsel for Linear in the ITC

8   Proceeding.

9          Again, that's what I classici ally view as a

10  stealth motion for summary judgment.  And I won't entertain

11  it.

12         The motion I am really most interested in

13  discussing is at 146.  It's Plaintiff's Motion No. 1,

14  Linear's Motion in Limine No. 1, To Preclude Monolithic from

15  offering at Trial Evidence and/or Argument that the Asserted

16  Claims are Limited to two States of Operation.  The only

17  reason I am most interested in discussing it:  I believe

18  both parties are asking the Court to open claim

19  construction.

20         You go first.

21         MR. FREED:  Your Honor, I think the substance of

22  our argument is this:  We don't intend, in any way, shape or

23  form, to preclude them from arguing that they don't have one

24  of the circuits, either the first circuit, the second

25  circuit, or the third circuit.  But we do believe that they

1   shouldn't be allowed to make the argument that they don't

2   have one of these circuits because they have an additional

3   circuit, because that really twists the claim from a

4   "comprising" claim into a "consisting" claim.

5           I don't want any different ruling on what these

6   circuits are.  I am not asking for any different ruling on

7   what these circuits are.  If I asked for a different one

8   before, I asked for it.  I am not asking for a

9   reconsideration of that.  I am not asking for a new

10  consideration.  I am just asking that they shouldn't be

11  allowed to present to the jury argument or evidence that the

12  reason you can't find we have a third circuit or a second

13  circuit is because we have this additional circuit, because

14  that would, indeed, both change your claim construction and

15  be inconsistent with your claim construction, and would,

16  indeed, making a "consisting of" claim into a "comprising"

17  claim.

18          It would, indeed, be saying that I can't

19  infringe a patent on a mechanical pencil because I put an

20  eraser on the pencil even though the eraser is not mentioned

21  anywhere in the claim.

22          That's it.

23          MR. McKONE:  David McKone, Your Honor.

24          This is a comprising claim.  However, the law,

25  the Federal Circuit has held that even if a claim is a

1    comprising claim, that can't be used as a, quote, "weasel

2    word" to get out of the every-day claim limitation.

3                THE COURT:  Are you asking me to reopen claim

4    construction?

5                MR. McKONE:  We don't believe it is necessary to

6    reopen claim construction.  The plain language of the claims

7    is written such that there is no intermediate state between

8    the first state of circuit operation and the second state of

9    circuit operation.

10               THE COURT:  It sure sounds like you are asking

11   me to open claim construction up.  But make your argument.

12               MR. McKONE:  Regarding whether we are asking you

13   to reopen claim construction based on changing our position,

14   that certainly hasn't been the case here.

15               Prior to the claim construction briefing, we

16   raised the issue that the accused product does not have the

17   second circuit -- I am sorry, the second state of circuit

18   operation and the threshold fraction limitation.  But at

19   that time Linear was contending that the accused product

20   was, in fact, a two-state product, one where it transitioned

21   from a continuous mode, which it was calling the first

22   state, to a second state that consisted of both the

23   discontinuous mode and the pulse-skip mode.

24               That was the framework prior to the claim

25   construction briefing that's been filed.

1              After the claim construction briefs had been

2      filed, Linear served its expert report, and for the first

3      time there, Linear contended that the accused product was a

4      three-stage product, at least, one where it transitioned

5      from a continuous mode, which it seems to be calling the

6      first state of circuit operation, to a discontinuous mode,

7      and from there into a pulse-skip mode, and somewhere in the

8      pulse-skip mode is where they are identifying the second

9      state of circuit operation.

10             Our expert report --

11             THE COURT:  That is the first time that we have

12     seen this argument?

13             MR. McKONE:  Yes.  Our expert report was merely

14     responding to that argument, pointing out that that was

15     inconsistent with the claim language as well as the

16     prosecution history and the specification.

17             MR. FREED:  Briefly, Your Honor.  During claim

18     construction, we weren't talking about what infringes and

19     what doesn't infringe at all.  We were just talking about

20     construction of the claim, because construction of the claim

21     isn't dictated by what infringes.  Our position on

22     infringement was and always is that all you have to do is

23     have what the claim calls for and whether you have anything

24     else doesn't matter.

25             So we have never changed our position on that.

1     It has been continuous on that.  Nor did we ever take the

2     position that the claims were limited in some way to

3     continuous stages without any intervening stages or anything

4     like that.  It's not a first-time argument.

5              What is the first-time argument is that the

6     claim should be construed in a way that would permit you to

7     close the claim when it's an open claim.

8              MR. McKONE:  Your Honor knows that claim

9     construction is not supposed to be with respect to the

10    accused product.  But at the same time, you don't want us

11    bringing up arguments that are not pertinent to what they

12    are alleging our accused product is doing.

13             So it didn't make sense prior to the claim

14    construction briefing to phrase our arguments in terms of a

15    three-state product wouldn't infringe.  Instead, what we did

16    is looked at what they identified as a second state, which

17    included both what they are now identifying as a second

18    state plus what they are now identifying as the intermediate

19    state, and pointing out those two states together did not

20    meet the claim language for second state of circuit

21    operations.

22             When they came up with the new analysis in the

23    expert report, we had to respond to that new analysis.

24             THE COURT:  I am listening.

25             This is one I am going to have to take under

1    advisement and think about a little bit and get back to you

2    in some written form.

3                    All right.  Let's go to Linear's No.2, Docket

4    Item 147.  It's a Motion to Preclude Monolithic from Raising

5    Issues of Inequitable Conduct and Patent Misuse before the

6    Jury.

7                    And, perhaps I should -- just bear with me one

8    second.

9                    (Pause.)

10                   THE COURT:  We had originally set eight days

11   aside for this case.  Right?

12                   MR. FREED:  That's correct, Your Honor.

13                   THE COURT:  It is not going to take eight days.

14   One of the reasons it is not going to take eight days for

15   the jury to try this case is I am going to grant this

16   motion, for purely prudential reasons, quite frankly.  I am

17   going to be very up front about that.

18                   We start the 23rd.

19                   MR. FREED:  Correct, Your Honor.

20                   THE COURT:  Here is the thing, counsel.  I am

21   going to have to recess this trial for part of one day on

22   the 26th and all of the 27th.  We will resume on that

23   Monday, the 28th.  I have a matter I have to attend on our

24   left coast for the Federal Circuit Bar Association.

25                   And then, I am not going to put the jury or you

1    in a position of having the jury being focused more on the

2    impending July 4th Holiday in its deliberations.

3              I think a couple of rulings are going to impact

4    the amount of time that we are going to discuss today, the

5    amount of time that you are going to need.  But this we are

6    not going to discuss, because I am going to grant it, for

7    the reasons I have just outlined.

8              I think that should cut down the amount of time

9    that will be needed with the jury.

10              Counsel well-know that I have handled

11   inequitable conduct issues in each of the three ways that

12   the Federal Circuit has endorsed.  If the parties agree, I

13   have let it go to the jury.  I have used the jury as an

14   advisory jury, and taken on the issues as the Court deciding

15   the issue.  In this instance it would be the Court that

16   would decide those issues.

17              So that motion is granted.

18              No. 3, this is at Docket Item No. 148, it's

19   Linear's Motion to Preclude Monolithic from Referring to, or

20   Offering Evidence relating to, the Amount of Sales of the

21   Accused MP1543 Product or the Stipulated Amount of Patent

22   Infringement Damages before the Jury.

23              Counsel.

24              MR. FREED:  Your Honor, it is a simple motion.

25   Patent infringement damages is not an issue in this case

 1    because there has been a stipulation on damages.  To the

 2    extent there is an infringement case here, the question is

 3    just simply infringement, and the amount of damages isn't

 4    before the jury.

 5            There is one reason and one reason only for the

 6    other side to put the issue of the amount of damages in

 7    front of the jury.  And that is to have the jury be thinking

 8    about, well, this isn't such a big deal because the damages

 9    are small, which is not relevant to the question of breach

10    of contract or to the question of infringement.  So it can

11    only be used for a purpose inappropriate, in our view.

12            MR. FLAGEL:  Your Honor, Mr. Freed talks about

13    the amount of damages.  But he doesn't mention the amount of

14    sales.  They are asking that we be precluded from telling

15    the jury that only a hundred of these actual small circuits

16    were ever delivered in the United States to customers.

17            They have an indirect infringement argument.  In

18    order to prove indirect infringement, they have to actually

19    prove that a customer used these chips.  They have no

20    evidence, by the way, that any customer used the chips.

21    They want to say that we have sold products and therefore

22    their customers must have used the chips in accordance with

23    data sheets.  Only a hundred were sold, and there is no

24    evidence that anybody used them.

25            In this kind of business, you have to buy a lot

1    of these things.  These are tiny little circuits that are

2    used in devices.  The fact that only a hundred were sold is

3    strong evidence that there was never any use by a customer

4    of this product in any way, much less in an infringing way.

5              So it is very relevant to that.

6              It is also relevant because Linear is going to

7    argue that commercial success is evidence of nonobviousness.

8    This product didn't sell at all.  Nobody bought it.  They

9    are alleging it's infringing.

10             If they are right about that -- we think they

11   are not -- but if they are right, then it's strong evidence

12   of obviousness, not nonobviousness, and it's really

13   important to rebut their argument of indirect infringement.

14             THE COURT:  Counsel seems to concede the point

15   as to the liquidated damages issue.

16             MR. FREED:  It appears that way, Your Honor.

17   The two issues on the indirect infringement, there is a

18   false logic there, Your Honor.  We don't have to prove

19   that -- let me put it this way:  If they sold one of them,

20   the issue of whether or not there was a direct infringement

21   doesn't depend upon whether they sold two, three, or 3,000.

22   Our evidence of direct infringement in that context, we have

23   direct infringement by themselves.  But the direct

24   infringement that supports our indirect infringement claim,

25   i.e. direct infringement by customers, is a circumstantial

1    case that is proved under the law by proof that there is no

2    substantial use other than for the intended purpose.  That

3    will be our proof, that there is no substantial use other

4    than for the intended purpose.

5             That is true for one, it's true for ten, it's

6    true for 2000.  If they only sold a hundred, that doesn't

7    change the fact that the only substantial use people buy

8    those for is their intended purpose, and therefore the jury

9    is allowed to conclude circumstantially that the direct

10   infringement occurred.

11            Customers didn't use these things for

12   paperweights or ships' ballast.  If they want to make that

13   argument, that is fine.  But they shouldn't be able to make

14   the argument that, just because they sold a hundred of them,

15   that customers didn't use them for the intended purpose.

16            On the issue of obviousness, that is a very

17   novel theory, Your Honor.  The fact that there is commercial

18   success by our product and therefore that that is a

19   secondary consideration of nonobviousness isn't negated by

20   the fact that they only sold a hundred, especially when we

21   have testimony that they pulled them from the market because

22   of this case.

23            There is no bearing on their having pulled this

24   thing from the market on this being nonobvious.  The

25   argument that somehow or other, that because they only sold

1    a hundred is a circumstance of the obviousness of the

2    invention is, frankly, silly, Your Honor.

3            MR. FLAGEL:  A couple of points.  On liquidated

4    damages, I might have made an unfair assumption.  Since you

5    had ruled inequitable conduct, you were going to hear it,

6    given the jury constraints, I sort of assumed you were going

7    to hear liquidated damages and whether that's enforceable.

8            THE COURT:  That is fine.

9            MR. FLAGEL:  If it goes to the jury, I think it

10   has to be denied, because if they are going to ask the jury

11   for three million dollars in liquidated damages, I do think,

12   in determining whether --

13           THE COURT:  What is your reaction to that?

14           MR. FREED:  My reaction is that's got a time

15   warp associated with it.  The issue of the viability of

16   liquid damages is the date of the contract, not what

17   happened afterwards.  Not what they did sell, but whether it

18   was reasonable under the circumstances of the envisioned

19   activity -- and most of the liquid damages testimony we are

20   going to put on doesn't have to do with sales as such, but

21   has to do with the aggravation and the diversion of

22   employment activity that occurs when somebody infringes a

23   patent at a later point in time.

24           But even as to damages, even as to damages, it

25   is what is contemplated at the time, not what actually

1    happened.  That is not a relevant factor of whether the

2    parties reasonably had in their contemplation what would be

3    appropriate liquidated damages when they entered into the

4    contract.  The fact that they only sold a hundred after

5    there was a breach or alleged breach and a withdrawal from

6    the market doesn't change the viability of that.  It's not

7    what you did do.  It's whether the parties were reasonable

8    at the time they entered into the agreement.

9            MR. FLAGEL:  I disagree.  I think the law is

10   clear that the actual damages that somebody seeks is a

11   relevant fact in determining whether the amount of

12   liquidated damages is an unenforceable penalty.  On that

13   point, I think he is wrong.

14           THE COURT:  I think he is right.  I am going to

15   hear the liquidated damages issue.  I agree with you on

16   that, not necessarily on the law.

17           MR. FLAGEL:  Responding on the hundred units,

18   again, he is asking you to just sort of assume that because

19   we sold a hundred they were obviously used and that we can't

20   tell the jury.  He wants to preclude us from arguing to the

21   jury that there is no evidence of indirect infringement

22   because only a handful of these are sold.  These are

23   typically only used when lots of them are sold.  They might

24   have been put on the shelf.  We don't know.

25           There is no evidence, and it is their burden to

1    come forward with evidence.  And how can our hands be tied

2    from telling the jury, ladies and gentlemen, they have no

3    evidence?

4                THERE were only a very few of these sold before

5    we stopped selling them.

6                THE COURT:  What is your reaction to his

7    observations regarding the alleged novelty of your theory,

8    as it bears on the issue of secondary considerations and

9    obviousness?

10                MR. FLAGEL:  To the extent that the jury finds

11    that these 100 pieces infringe, then the fact that nobody

12    wanted them is directly relevant to the commercial success

13    point.

14                THE COURT:  So your position is that there is at

15    least a material dispute of fact as to whether anybody

16    wanted them and that is a jury issue.

17                MR. FLAGEL:  Yes.

18                THE COURT:  Go ahead.

19                MR. FREED:  Your Honor, I think I have said it

20    all.  The evidence is they pulled them from the market.

21                THE COURT:  The jury can hear that.  I will let

22    the jury hear that.

23                The motion is granted in part, denied in part,

24    however you want --

25                MR. FREED:  You are going to hear the liquidated

1    damages.

2              THE COURT:  I am going to hear the liquidated

3    damages, and deny the motion as to the numbers of units.

4              MR. FLAGEL:  Thank you, Your Honor.

5              I think that's all of plaintiff's motions.

6              So we are on MPS's No. 1.  There is actually 1A

7    and B, I think.  Correct me if you think I am wrong about

8    that.  But there is the motion at 141, which seeks to

9    preclude Linear from presenting to the jury evidence and

10   argument concerning the enforceability of the three million

11   dollars liquidated damages provision in the settlement and

12   license agreement.  Then there is this 140, is the docket

13   item, I think I have got it right.  This is bifurcation.  I

14   think they are together.

15             MR. McKONE:  I think Your Honor has ruled.

16             THE COURT:  I think I have.

17             So we are now on 3.  This is at 143.  This is a

18   Motion to Preclude Linear from Presenting any evidence

19   Concerning its Settlement and License Agreements with Third

20   Parties, including Maxim Integrated Products.

21             I think the central issue is whether the

22   licenses are relevant to the question of nonobviousness.

23             MR. FREED:  I think so, Your Honor.

24             MR. HORWITZ:  Your Honor, we think this is a

25   cut-and-dried motion in limine.  Frankly, we are surprised

1    we had to bring it, based on Your Honor's rulings and other

2    rulings from other Judges in this Court.

3           If it is a litigation settlement license, it

4    doesn't come in under Rule 408 and under Rule 403.  That's

5    what we are talking about here.

6           And the comments that were made after by Maxim's

7    CEO relate to the settlement of litigation license.  So it

8    is all part of the same package.

9           They say that, well, his statements are

10   different, they are not offered for the truth of the matter.

11   They obviously are.

12          It seems pretty cut and dried, Your Honor.

13          THE COURT:  Well, there seems to be a debate

14   about whether Telcordia is distinguishable.

15          MR. HORWITZ:  I really don't think there is any

16   basis to distinguish either Telcordia or Pharmastem.  The

17   basic concept is, if it's a license agreement that arises

18   out of settlement of litigation, it doesn't come in for this

19   purpose, under both Rule 408 and Rule 403, for undue

20   prejudice.

21          MR. FREED:  Again, Your Honor, the issues

22   involved in Telcordia are different from the issues involved

23   here.  This is specifically directed to this patent.  There

24   is no question that it's a relationship to this patent.

25          We also have the additional evidence where there

1     is no secret about why the license was taken.  The man

2     stated, in a situation where he would have serious

3     securities problems if he were not telling the truth, why he

4     took the license.  He said on the public record in one of

5     these securities deals where you have to be straightforward

6     with your audience that he took it because there was no good

7     prior art and because it was a broad patent.  If there was

8     ever a secondary consideration of nonobviousness, that is

9     it.

10              MR. HORWITZ:  Your Honor, on the first point,

11    Pharmastem is just the same.  Telcordia may have had --

12    there may have been more patents.  But the concept in all

13    the cases is the same.  It doesn't come in because of the

14    other considerations.

15              To suggest that the CEO who is talking about

16    those license agreements, that somehow insulates them from

17    the rule that otherwise applies, it just dissolves the rule.

18    And clearly, it's hearsay.  It's being offered for the truth

19    of the matter asserted.  Plain and simple.

20              THE COURT:  I want to make sure that my ruling

21    is consistent with previous pronouncements of this Court.

22    So I am going to reserve on this one.  I will announce this

23    in writing.  These are not going to be long pontifications.

24    They will just be short "Whereas" orders.

25              I will let you try to tell me why this isn't

1   another motion for summary judgment No. 4.

2               MR. DUNLAVEY:  Your Honor, this is sort of a

3   piece of the earlier Motion in Limine No. 3 of Linear's that

4   you denied.

5               This is a case where they have the burden of

6   establishing infringement.  They are now proceeding under

7   two theories of direct infringement and an indirect

8   infringement theory.  The indirect infringement theory is

9   that somehow one of these 100 chips, which itself doesn't

10   infringe, must have been used by somebody.

11               They didn't undertake any discovery of this.

12   The chips went to two companies.  They didn't go to either

13   one of those companies to find out whether those chips are

14   gathering dust, whether those chips were subsequently sold

15   to other companies.

16               They haven't done -- they also have this

17   contention that only appeared in their expert's report that

18   the indirect infringement was induced by MPS supplying the

19   chip and data sheets to these customers.  There is no

20   evidence that MPS has provided a data sheet to any of these

21   companies in the chain of command.  So there is just a

22   complete absence of proof here.

23               THE COURT:  Can I handle this on JMOL?  If there

24   is a failure of proof, there is a failure of proof.

25               MR. DUNLAVEY:  That's one way to do it.

```
 1                THE COURT:  That is the way I will do it.  So I
 2      am going to deny this.
 3                MR. FLAGEL:  For the record, Your Honor, we are
 4      hoping you are going to handle No. 2 that way, too, even
 5      though it has been denied.
 6                THE COURT:  Sure.  If there is an appropriate
 7      basis on JMOL, Rule 50, Rule 52, whatever the relevant rules
 8      are.
 9                Finally, No. 5 is MPS's Motion to Preclude
10      Linear from Presenting Hearsay Evidence to the Jury,
11      Including any Evidence concerning the ITC Proceedings.
12                To sort of short-circuit this, I thought we
13      could address these objections to the extent they arise in
14      realtime.  Is that problematic from MPS's point of view?
15                MR. DUNLAVEY:  In theory, no.  I think that in
16      practice it might be difficult in that I think that they
17      will try to present a flood of evidence about the AATI case
18      and about the Impala case through their expert witness,
19      which I think is completely improper.  And their expert
20      witness' report is just replete with references to those two
21      litigations.  Why we can't focus on the facts of this case,
22      I don't know.
23                You have already told us, we are not having
24      eight days.  We are having something substantially shorter.
25      The notion that we are going to have to try AATI's
```

1    infringement and its invalidity claims and the Impala

2    decision and the products that were at issue in this case,

3    and intermittent statements by people in that case, I think

4    it flies in the face of, number one, what we are entitled to

5    under the rules of evidence, but also your Court's schedule.

6         MR. FREED:  We have no intention of retrying the

7    AATI case or any other case.  I think the proper way to deal

8    with this is if we go out of bounds on what we are doing, we

9    deal with it on a realtime basis, as you suggested.

10        Our expert isn't going to get up there and talk

11   about the other case.  They want to hamstring him to make

12   sure that he can't even mention something in connection with

13   the other case when it is directly relevant to testimony

14   that he has given.

15        He is not up there to tell everybody what

16   happened in the other case.  He is up there to tell

17   everybody about the issues in this case.  In the course of

18   doing that, on occasion, on his opinions, there will be a

19   reference to the other case, but that is not going to be

20   terrible, and it's not going to be retrying.

21        THE COURT:  What kind of reference?

22        MR. FREED:  They assert that particular things

23   are very good evidence on invalidity -- we are on the

24   invalidity theory -- these things are terrific evidence on

25   invalidity and no one ever knew about these things before.

1    And he says, no, in fact, these are the very issues that I

2    dealt with before and they were wrong before and they are

3    wrong now.

4            It's not to prove the other case.

5            THE COURT:  Why does he need to say that?

6            MR. FREED:  Only because they are making believe

7    that this is all fresh evidence that has never surfaced

8    before, when, in fact, this is really yesterday's dinner

9    warmed over again and this guy is treating it as yesterday's

10   dinner warmed over again.  And it should be treated that

11   way, because that's what it is.

12           MR. DUNLAVEY:  Your Honor, the notion that Mr.

13   Blauschild can get up and say, Oh, I addressed this in

14   another case and it was garbage in another case --

15           THE COURT:  That is not going to happen.  And I

16   don't want to have to deal with that.

17           I am going to grant this motion.  To the extent

18   that you elicit from the witness testimony that is properly

19   adduced, that doesn't improperly, in my view, reference

20   other proceedings, I will permit it.

21           But I have granted the motion.  And I would

22   expect you to abide by its spirit, if not its letter.

23   Please, we can still address issues in realtime.

24           MR. FREED:  I understand.  There was a separate

25   part of this thing that looked like it was trying to

1    preclude us from using Wilcox's testimony from that prior

2    case.  This is one of the inventors who has a very serious

3    medical condition.  It is clearly within the rules --

4              THE COURT:  Let's talk about that.

5              MR. DUNLAVEY:  There is an issue there, yes.

6    Mr. Wilcox was not deposed in this case.  He was deposed in

7    an earlier case that MPS was not party to.  We were not

8    given notice of that.  This happened years ago.  They have

9    made no showing, by the way, that Mr. Wilcox presently is

10   unavailable.  They simply didn't list him on their witness

11   list.

12             I understand that in the case that was before

13   Your Honor up until recently, the Linear versus Analog

14   Devices case, that Mr. Wilcox was noticed for deposition

15   and, in fact, he showed up for his deposition.  But the

16   parties had settled before his deposition actually took

17   place.

18             So, number one, under Rule 32, his deposition

19   testimony should not come in.

20             Number two, they haven't made any showing that

21   he is unavailable at present.  They have some doctor's note

22   from 2005 and another one from 2006, saying that his health

23   is such that it might be difficult for him to travel to the

24   trial.  There is nothing from 2008.  And certainly, we were

25   not informed at the time when we could undertake discovery

```
 1   on this issue that they were going to claim that Mr. Wilcox

 2   was unavailable.

 3               I understand that in the other litigations,

 4   people have found out that Mr. Wilcox is out taking hikes in

 5   the Sierras.  He is out gazing at stars late at night.  He

 6   is engaged in all kinds of discussions with people.

 7               There is just no evidence before you that he is

 8   unavailable.

 9               So for all of those reasons, I think that Mr.

10   Wilcox's testimony from the Impala case -- again, we never

11   had a chance to question him -- is not admissible.

12               THE COURT:  The Analog Devices case, when was he

13   noticed and prepared to appear for that deposition, roughly

14   speaking?

15               MR. DUNLAVEY:  Your Honor, I would have to

16   check.

17               THE COURT:  Was it last year?

18               MR. DUNLAVEY:  Yes, it was 2007, or early part

19   of 2008.

20               MR. FREED:  Your Honor, that's not quite the

21   whole story.  Back when they were involved with the Linear

22   litigation, the doctor's certificate or note or whatever you

23   want to call it was presented to them.  And they agreed not

24   to take his deposition under those circumstances.  They

25   actually agreed to that.
```

```
 1              Analog re-raised the issue, including all the

 2    issues about the fact that the guy does go outside of his

 3    house.  It is not that he is dead.  It's that the doctor

 4    thinks that this is just going to hurt him.

 5              THE COURT:  Where does he live?

 6              MR. FREED:  He is in California.  I am not sure.

 7              Arizona.

 8              THE COURT:  How old is the gentleman?

 9              MR. FREED:  Early sixties, I guess, late

10    fifties.  I don't know what the medical --

11              THE COURT:  Without putting his entire medical

12    history on the record, what is the condition from which he

13    suffers?

14              MR. FREED:  I was unclear about it, because I

15    wasn't involved.  I do know that when that issue was raised

16    in the Analog case, the Judge re-looked at the thing again

17    in the Analog case, and said basically there is no -- you

18    shouldn't be dragging this guy here.  The fact that he went

19    outdoors isn't the end of the story.  He shouldn't be forced

20    to go through testimony and that kind of stress.

21              THE COURT:  All I have right now is attorney

22    argument.  I don't have any declaration.  I don't have

23    anything from a doctor, a physician, or from the gentleman

24    himself as to his condition.  All I have is, admittedly,

25    representations by officers of the Court.  And I tend to
```

1    trust you guys, men and women.  But these are competing --

2    yes.

3                MR. DUNLAVEY:  That's exactly right, Your Honor.

4    And it's their burden of showing that he is unavailable.  He

5    is not on their witness list.  They never raised this issue

6    before.  They failed to meet their burden.  So that should

7    be the end of the matter.

8                MR. FREED:  Your Honor, at this point, if we

9    need to provide those things to the Court, we will.

10               It may be that this person, we may want to use

11   him only on validity issues.  And if that's so and if we do

12   have this staged trial and it comes up at that point in

13   time, this may all wash out.  In the meantime, if we need to

14   get those doctor things and statements, we can get them.

15               THE COURT:  Okay.  That's one complaint that has

16   been raised by MPS.  But I think they have at least one

17   other that I recall.  That is, that you were not a

18   participant in the other proceeding.

19               MR. DUNLAVEY:  That is absolutely correct.

20               THE COURT:  That is a part of the requirement of

21   the rule, it seems to me.

22               MR. FREED:  The rule requires that they have an

23   aligned interest.  Clearly, there was an aligned interest

24   there.  In fact, that was the secret proceeding that

25   involved all the warmed-over meals that I spoke about

1    earlier.  They had an aligned interest.

2              MR. DUNLAVEY:  I don't believe that MPS had even

3    come into existence at the time that the initial lawsuit was

4    filed, Your Honor.  It was not a party to Impala.  It had no

5    knowledge about the proceedings in Impala.  Rule 32

6    specifies that in such a condition, that his deposition is

7    not admissible.  And again, if they wanted to have raised

8    this issue, they should have raised it during the time that

9    we had an opportunity to actually conduct some discovery.

10             THE COURT:  I am constrained --

11             MR. FREED:  Your Honor, on the issue of did they

12   have an opportunity to take discovery from this guy, I have

13   to say this.  I know it's a strong word.  I have to say,

14   that is a little disingenuous.  We are talking about an

15   inventor on the face of the patent.

16             To argue they had no opportunity or no

17   knowledge, I mean, Rule 26 disclosures talk about

18   disclosures are otherwise made known.  Well, the patent on

19   its face otherwise makes known this guy's contact with the

20   subject matter of this litigation.

21             To say that he is a complete surprise to them,

22   when, in fact, they were the ones who said give us

23   everything involved in the AATI litigation, he is on the

24   face of the patent, they had access completely to the files

25   in the other litigation.

```
 1              To argue that they had no opportunity to take
 2    this guy's deposition I think is disingenuous, Your Honor.
 3              MR. DUNLAVEY:  He wasn't on the witness list and
 4    they didn't produce the information from the Impala case
 5    back in this case until sometime in 2007.  For them to say,
 6    oh, even though we don't have him listed on our witness list
 7    and he is not in our initial disclosures that you then have
 8    an obligation to go out or else we can use some depositions
 9    in a previous case that you didn't participate in, that, I
10    think, is disingenuous.
11              THE COURT:  I won't get into characterizing one
12    party's view or the other.  But I at this point am
13    constrained to conclude that the requirements of Rule 32
14    have not been met by the plaintiff.  Should it come to
15    pass -- well, I am going to leave it there.  I am going to
16    grant that part of the motion.
17              MR. FREED:  Your Honor, I don't want to --
18              THE COURT:  Here is -- look:  I don't want to
19    have this Court or the parties have a material and
20    potentially adverse impact on the health of a party or a
21    nonparty.
22              I am not going to allow, not that you intended
23    this, but that issue, the individual's health, Mr. Wilcox --
24    Doctor or Mister?
25              MR. FREED:  Mister, I think.
```

```
 1              THE COURT:  -- Mr. Wilcox's health and the

 2    vagaries of his situation work to the detriment, to unfairly

 3    prejudice the other side.

 4              If it should come to pass that this is -- we

 5    would have to know this very soon -- that this is evidence

 6    that you deem critical and that he could be made available

 7    conveniently for a deposition, I might consider a request to

 8    revise my ruling.  Right now, the ruling is what it is.

 9              MR. FREED:  Your Honor, I think it unlikely that

10    we are going to want to put him in that position.  Thank you

11    for that potential opportunity.  I know you haven't agreed

12    to it.  You said it's a potential opportunity.  I think it's

13    unlikely that we are going to want to put him in that

14    position.  And if it comes to that, all I would ask is that

15    we don't have some argument in front of the jury, Boy, this

16    guy isn't here at trial and therefore --

17              THE COURT:  A, I think that would not be quite

18    kosher.

19              MR. DUNLAVEY:  Of course not, Your Honor.

20              THE COURT:  I won't permit that.  It's not

21    intended.

22              MR. FREED:  That may be the way this washes out,

23    because we are not going to endanger this guy's health.

24              THE COURT:  I am glad to hear that.

25              All right.  I gather everyone agrees with me
```

1    that we should defer discussion about the preliminary jury

2    discussions?

3              MR. FREED:  I think they need to be looked at

4    again, Your Honor, given your rulings.

5              THE COURT:  I think they do.

6              MR. FREED:  I can't remember specifically which

7    ones, but I am guessing your rulings are going to impact

8    some of those.

9              THE COURT:  I have some tabs.  I will just

10    highlight the pages that I have tabbed.  There is the

11    parties and their contentions at Page 4.  It goes on, Linear

12    sets forth its objections specifically on the next page.

13    Then the next one I see is at Page 8, the burden of proof,

14    that begins a conversation.  That is Linear's proposal as to

15    the burden of proof and the MPS objections on the following

16    page.

17              Then MPS offers a burden of proof instruction

18    beginning at Page 10.  The controversy or the disagreement

19    continues on over into Pages 11 and 12.

20              Then, finally, the summary of the patent issues

21    is contested.

22              Let me offer this.  To the extent that there

23    remains disagreement on this issue, these issues, we can

24    convene a later teleconference to deal with it.

25              MR. FLAGEL:  That will be fine, Your Honor.

1           MR. HORWITZ:  Your Honor, could we try to set a

2     deadline today by when we will be able to get back to you

3     either in agreement or disagreement?

4           THE COURT:  Well, do you want to set a deadline?

5     It's up to you.

6           MR. FREED:  If they have a deadline in mind, I

7     am sure I am going to probably agree with it.

8           THE COURT:  I don't think I have to micromanage

9     that.  Here is what you need to keep in mind.  We are

10    awfully busy, to say the least.  And I just came off trial

11    yesterday -- you don't need to hear my problems.  We have

12    all got problems.

13          The point is that time is at a premium.  So

14    sooner rather than later helps me position something for a

15    teleconference or some other proceeding.  That's really the

16    point.

17          Let's talk about the voir dire.  Again, I didn't

18    see anything particularly controversial.

19          I have first MPS's proposed voir dire, that is

20    at Item 174, and actually, it was 171 that was -- Linear's

21    was filed first.  I assume you misplaced them.  There is a

22    Question 21 that frankly I don't see the need for.  But it's

23    phrased, Some of the witnesses in this case were born

24    outside the United States and speak with an accent.  Is

25    there anything about that fact or the fact that a witness'

```
 1    first language is not English that would cause you to be

 2    less inclined to believe that witness or rely upon his

 3    testimony?  This is MPS's proposed voir dire question.

 4              MR. STERN:  Your Honor, there are four -- Linear

 5    and MPS have submitted virtually identical --

 6              THE COURT:  You have.

 7              MR. STERN:  There are only four differences in

 8    questions.

 9              THE COURT:  I counted three.  I am glad to hear

10    you picked up another.

11              MR. STERN:  In our voir dire it is 18, 21, 22

12    and 25.  I may be wrong about that.  I went through these

13    last night.  I believe those were the ones.

14              THE COURT:  Let's talk about that one, then we

15    can go back to 18.

16              MR. STERN:  That's fine.  Your Honor, overall,

17    what we want to make sure is we suffer no prejudice at all

18    from the jury in this case.  In this case it is very likely

19    that our witnesses will be testifying in a language other

20    than English.  We want to ferret it out in a way that is not

21    offensive and aligned with the jury as not being any

22    problem.

23              THE COURT:  You have no problem with the

24    question.

25              MR. FREED:  I think it calls undue attention to
```

1    the issue.  That is my problem.  I don't have any problem

2    with the substance of these, of the idea that people aren't

3    supposed to be looked at in any different way for these

4    reasons.  But when you call it out that way, it's almost an

5    attack that says that's what we are trying to do.  That's

6    what I don't like about it.

7              THE COURT:  The thing that concerns me, that I

8    think it doesn't give our citizens who serve on these juries

9    sufficient credit.  And we are a pluralistic,

10   multi-cultural, multidenominational nation, and I am

11   wondering if there is an underlying assumption that isn't

12   fair to the jurors.  It is phrased inoffensively.  I don't

13   disagree with you on that.  I am just wondering about the

14   need.

15             MR. STERN:  Again, Your Honor, actually, I think

16   if Your Honor looks at voir dire Questions 21 and 22, they

17   both have the same --

18             THE COURT:  Yes.

19             MR. STERN:  It is not actually -- we actually

20   view them as alternatives.  It is not necessary that we

21   obtain both.  We are prepared to limit what Your Honor feels

22   is most appropriate.  But we want to make sure there is no

23   problem with respect to this in light of the nature of the

24   witnesses that we are going to be presenting.

25             THE COURT:  I will give it some thought.  As to

1    21 and 22, I had, frankly, missed --

2              MR. STERN:  If Your Honor feels for any reason

3    they should be reformulated, we are happy to do it.

4              THE COURT:  Here is what I will do, what I

5    typically do, if I do feel that way, in other words, if I am

6    not just going to strike them but some reformulation is

7    necessary, I will do that.  You will get an e-mail from me

8    in advance of this.  It will actually come from Ms. Walker.

9    We will invite your comments.  Should there be comment, I

10   will seriously consider it and either incorporate it or not.

11             MR. STERN:  That is fine.

12             THE COURT:  You will have the final -- how the

13   voir dire is finally going to look before you come over to

14   pick the jury.

15             Okay.  18.  Let's see.  Well, do any of you have

16   any views that because a patent is issued by the U.S.

17   Government it must be valid?  Isn't it?

18             MR. STERN:  It is certainly presumed valid.  We

19   all know that.  This is trying to ferret something out from

20   the jury to see whether or not they feel it is more than

21   just a presumption.

22             THE COURT:  I am going to tell them in the

23   preliminary instruction, and the video is certainly going to

24   tell them that, that statutorily and constitutionally the

25   patent is presumed valid.  I know, depending upon which side

```
 1    of the table you guys are on in any given case, you either
 2    agree or disagree with that.  I understand that.
 3                Linear.
 4                MR. FREED:  Your Honor, I think you are going to
 5    tell them, even if the video doesn't, and even if we don't
 6    use the video, they are going to be instructed on that
 7    point.  I don't think there is going to be any -- half a
 8    loaf just doesn't work here.
 9                THE COURT:  I think this question could
10    potentially be a little confusing, as well.  I am not going
11    to ask this one.
12                MR. STERN:  Thank you, Your Honor.
13                THE COURT:  So then 25.
14                MR. STERN:  Your Honor has granted our motion.
15    So that is really irrelevant at this point.
16                I believe that's it, Your Honor.
17                THE COURT:  Okay.  Linear agrees?
18                MR. FREED:  That 25 is out?
19                THE COURT:  Yes.
20                MR. FREED:  Yes, I agree.
21                We had a different 18 that they dropped,
22    actually the substance of theirs.
23                THE COURT:  Have you or anyone in your immediate
24    family or anyone close to you ever applied for or obtained a
25    patent in the U.S. or abroad?  I typically do ask that
```

1      question.  Any objection?

2                 MR. STERN:  I think we have that as 19.

3                 MR. FREED:  My mistake.

4                 MR. STERN:  No objection, Judge.

5                 THE COURT:  Like the final jury instructions,

6      you will need to do some additional work on the verdict

7      form, I think.  You have competing proposals.  Right?  That

8      is typically the case, and I understand that to the

9      extent -- and I know jury verdict forms are often hotly

10     contested items.  You will need to do what you can.

11                MR. FREED:  We need to work on that given your

12     rulings as well.

13                MR. STERN:  Absolutely.

14                THE COURT:  All right.

15                MR. FREED:  We would have to have two verdict

16     forms if you are going to have this --

17                THE COURT:  Or some form of special

18     interrogatories.

19                MR. FREED:  I mean the sequential trial issue.

20                THE COURT:  Do you want to address that?

21                MR. FREED:  I really do think, especially given

22     the time issues and the Court's observation that no one

23     wants to be pressed about July 4th Weekend, you don't want

24     to press us, we don't want to press the jury, and you do

25     have a prior engagement during part of the time, I think

1    that even makes more sense to do the contract stuff, get the

2    jury out and done on that issue.  Then we know where we are

3    on whether or not there is even going to be a need to have

4    the invalidity stuff.

5                THE COURT:  Do you feel you would like some

6    additional time to think about this, in light of the Court's

7    ruling, and revisit this during a planned teleconference?

8                MR. FLAGEL:  I think that would be good, Your

9    Honor.

10               MR. FREED:  Makes sense.

11               THE COURT:  Why don't we set a teleconference

12   date and time.  What would you think, counsel, makes sense

13   in this regard?  How far out?

14               MR. FREED:  To take a page out of someone else's

15   book, I think sooner is better than later.  We already know

16   what our position is.  As soon as they are ready, we are

17   ready to talk to you about it.

18               THE COURT:  Why don't you notify us that you are

19   ready to talk.  And we will let Ms. Tyer-Daly know, and we

20   will get you on the calendar.

21               MS. JACOBS LOUDEN:  If we can just ask a

22   technical question.  When we do resubmit jury materials to

23   the Court, are you still using Word Perfect or is Word

24   acceptable?

25               THE COURT:  We do have both.  In spite of the

```
1    fact that the rest of the world uses Word, the Federal

2    Judiciary continues to use Word Perfect.  I don't know if we

3    have some deal with that.

4                    MR. FREED:  I think I know the answer.

5                    THE COURT:  Do you have Word Perfect capacity?

6                    MS. JACOBS LOUDEN:  We do.  I have to say, in

7    the private sector we always use Word.  The problem is when

8    we go to convert it to Word Perfect I think it always comes

9    to you, as much as we try to clean up the mess, there is

10   always some mess left in it.

11                   THE COURT:  We are okay with Word.

12                   MS. JACOBS LOUDEN:  Thank you.

13                   THE COURT:  The young folks over here are much

14   more computer-literate than us old folks.

15                   So a few nits.

16                   Please, there will be a podium in the middle.

17   It's over there.  It has a mike.  You don't have to

18   necessarily question from the podium, but you do have to

19   rise.

20                   I don't permit questioning from the table.  You

21   don't have to be planted.  Some lawyers like to walk around

22   a little bit.  I just suggest you keep your voices elevated.

23   This is a room that does not have great acoustics.  You must

24   keep a respectful distance from the jury.  I don't want my

25   juries to be hovered over.  They don't like to be hovered
```

1    over.

2                When you want to approach a witness, oftentimes

3    it is the case that you will need to approach the witness

4    multiple times during the examination.  Please, just ask

5    once.  You will automatically be given leave to approach

6    freely.  With each witness, please ask for permission.

7                I am pretty formal and pretty much a pain in the

8    neck when it comes to being here in the courtroom,

9    particularly when our citizens are here serving.  So you

10   will see that.  I will sort of morph a little bit from the

11   more informal personality you see right now.  You need to be

12   mindful of that.  And don't be offended.  I will try to be

13   formal but not unfriendly.

14               When you need to move around the courtroom, you

15   will, to get a better view of an exhibit or something like

16   that, just ask permission and that kind of thing.

17               Please, please, address your IT people by their

18   surnames.  It's not Ron or Jean.  It's Mr., Ms.  Everybody

19   deserves the same respect in the room.  Of course, you will

20   address witnesses by their appropriate titles and surnames

21   as well.

22               Objections, please just rise.  But please do

23   rise and make your presence known to me.  Oftentimes, I will

24   be looking at the witness or at the jury or maybe even at my

25   computer screen.  Please do not misunderstand that when I am

1    looking at that computer or maybe even typing, I am

2    listening.  I really am.  I am hearing what's going on.

3              It took me a while to develop that facility.

4    But it's almost ten years now, Mr. Horwitz, can you believe

5    it?  It does take some time for us to figure out how to do

6    this thing called judging.  I have not figured out a lot of

7    it.  But some of it I have.  The one thing I have is how to

8    pay attention.  And I do pay attention to what's going on in

9    the room.  When I don't, there is an occasional lapse, I

10   will get you over to sidebar and we will have something read

11   back and I will say, counsel, what did you say?  I didn't

12   hear it.  What is the basis of the objection?  I didn't hear

13   it.  I will be frank to say that.  If you think I didn't

14   hear something, try to get me to sidebar.

15             Sidebars.  I don't enjoy them because our jurors

16   don't.  They really don't enjoy the fact that we converse

17   out of their presence.  I talk to juries all the time, and I

18   am sure you gentlemen and ladies do as well, because they

19   feel we are hiding things from them and treating them like

20   children, and we are not.  I think our system could tolerate

21   juries to hear more than we permit them to hear.

22             In any event, we have a white-noise machine.  We

23   will turn it on.  Get me to sidebar.  If you think I have

24   blown a ruling on an objection, or you really need to get an

25   argument on the record, and obviously we don't want to do it

1    in front of the jury necessarily, get me to sidebar.

2    Sometimes I will be a little prickly about that.  That is

3    your job.  You have got to be as thick-skinned as I am.  Get

4    me to sidebar.  I will go.

5            Please, you know, counsel like to I find

6    oftentimes refer to the number or the rule of evidence.

7    It's not that I don't know the numbers.  But I would rather

8    hear the substance of your objection.  That keys me right

9    into what the issue is.  I will confess, for a moment I have

10   to think of the number.  What is that?  And it comes pretty

11   quickly.  But I just as soon you say, Hearsay, whatever you

12   want to say.  Don't argue the objection, again, in front of

13   the jury.

14            Juror books, we will need 12 --

15            MS. WALKER:  14.

16            THE COURT:  14.  Here is the thing.  There are

17   two binder issues here.  I will urge you in the strongest

18   terms to each have binders of exhibits and only the exhibits

19   that you think are important for the jury to have in its

20   possession.

21            I have had a couple of patent trials in the

22   not-distant past where the lawyers for some reason in a

23   patent case didn't prepare jury binders.  And at some point

24   during both trials jurors let it be known that they were

25   having a difficult time following things because things were

1    flashing up on the screen and they couldn't really get a

2    handle on the point.  Even though your IT people and lawyers

3    do a good job with that, it's a wise thing, I think a

4    necessary thing, for you to let the jurors have what you

5    think you need to have.  Don't overwhelm them.  But I advise

6    you to have binders for each of the jurors.  I am told by

7    Ms. Walker we need 14 of those.

8            MR. FREED:  On the issue of jury binders, jury

9    books, sometimes it is also distracting to have all of that

10   stuff in there when you are starting.  Do you want that all

11   there from the start in the jury book or filled as the

12   evidence comes in?

13           THE COURT:  I think you should have it all in

14   there.  Again, this is going to require that counsel use

15   some judgment in terms of how much you put into a binder.

16           That raises something else.  I skipped past two

17   things.  That is the subject of exhibits, because the

18   binders have to contain exhibits that are agreed upon, and

19   that's important.

20           All your objections to all of the exhibits are

21   overruled, summarily, without prejudice to -- there is no

22   way today or over the next week that we would be able to

23   deal with all of the objections that have been interposed

24   and the various reasons for them.

25           Therefore, what we do around here is I will get

1    together with you, either at the beginning of the day or the

2    end of the trial day, and we will talk about exhibits that

3    you really have a meaningful objection, an important

4    objection to, and that you really want to advance, because

5    otherwise, all exhibits are now in, as of this moment.

6            Those that are not objected to -- let me

7    rephrase.  Including those that have been objected to, they

8    are now in.

9            You will get another opportunity to address that

10    to me.  But it will be as we go along.

11            Any questions about that.

12            MR. FREED:  I do have one question about it.

13            I think I understand what you are saying, that

14    they are in in the sense that no objections have been

15    granted.

16            THE COURT:  They have been overruled.

17            MR. FREED:  They have been overruled.  But do

18    you actually have to make a proffer with the witness?

19            THE COURT:  No.

20            MR. FREED:  They are in unless you object again.

21            THE COURT:  That's right.  They are in.  They

22    are part of the record.  So you are going to want to, this

23    places a premium on you paying some attention to your

24    evidence and what you feel is not proper evidence for the

25    jury's consideration.  And I will tell you that typically,

1    Delaware counsel, I think, will confirm that we don't have

2    more than we can handle in terms of the objections.  We do

3    have, typically we have meetings in the morning at 8:30 and

4    routinely I am available and Ms. Walker will stick her head

5    out in the courtroom, Have you got any issues, counsel?

6    Especially in a patent case, yes, they have issues.  And we

7    will deal with them.  Typically, they are evidentiary issues

8    of some type.  It might have to do with demonstrative

9    exhibits or evidentiary exhibits, or whatever the case will

10   be.

11             MR. FREED:  In giving that ruling, I think the

12   next question is pretty self-evident.  I take it you will

13   have no problem with the witness books that have the

14   witness --

15             THE COURT:  That is the second binder issue.

16   You should have binders for your witnesses.  You don't have

17   to.  To the extent that you would like to use binders -- and

18   I assume you will agree on a protocol for the exchange of

19   exhibits, notification of witnesses, who is appearing on any

20   given day, at any given hour and that kind of thing.

21             MR. FREED:  We have agreed actually on all those

22   exchanges, I believe, except for one.  The only one that is

23   outstanding is the demonstratives that would be used with

24   openings and closings.  Our position was that, you are

25   always preparing your openings and closings until the last

```
 1    minute.  So that that exchange should occur, if at all, an
 2    hour before you give an opening or closing, rather than days
 3    in advance or stuff like that.
 4              THE COURT:  That's fine.  But let me say this:
 5    To the extent you plan extensive use of demonstratives, like
 6    deposition excerpts and that kind of thing, in your
 7    openings, I am going to caution you against this.  This has
 8    been an issue that has been of some -- we have been
 9    discussing this for some reason of late.  MPS?
10              MR. FLAGEL:  All we want, Your Honor, is we
11    would like to have -- typically what lawyers do is prepare
12    PowerPoints or some kind of guide for the jury during
13    opening.  We think they ought to be at least in pretty good
14    shape by 6:00 p.m. the night before.  What we would like to
15    do is exchange them by 6:00 p.m. the night before.
16              THE COURT:  Any objection?
17              MR. FREED:  Yes.  Because you are always doing
18    an opening and closing after 6:00 p.m. the night before.
19    That's why I said, how about an hour before the opening is
20    given or the closing is given?
21              THE COURT:  That doesn't give you a chance to
22    meet with me to resolve any controversy.  At some point the
23    evening before, I will leave it to you to discuss what that
24    hour will be.  But an hour before doesn't work.
25              MR. FLAGEL:  Thank you, Your Honor.
```

```
 1                MR. FREED:  Thank you.

 2                THE COURT:  I am fortunate to have good people

 3      around me remind of things that I should remember on my own.

 4      Deposition designations, I don't get involved in that

 5      controversy, those discussions.  You are going to have to

 6      agree on the designations and counter-designations.  I just

 7      won't do it, so there is no point in asking me to do it.  I

 8      don't have the time to spend addressing the oftentimes vast

 9      numbers of depositions that you want to designate and

10      counter-designate.  So it's up to you.  Sorry about that.

11                MR. HORWITZ:  Your Honor, we had one question,

12      not about the issues with the designations themselves but in

13      presentation of the designations.

14                THE COURT:  If a designation raises an important

15      evidentiary issue, I mean an important evidentiary issue, I

16      will get involved in that.  But in terms of, you know, the

17      editorial, the advocacy stuff that obviously is going on

18      there and that underlies it, I am not going to get involved

19      in that.

20                MR. HORWITZ:  Thanks for the clarification.  I

21      assume we would bring that to you in the morning before.

22                THE COURT:  Yes.  It makes sense to.  And to the

23      extent that there remain serious evidentiary issues extant

24      as a result of the conversations that are going to take

25      place after you leave here, we can talk about them to the
```

1    extent we need to in the teleconference.  Go ahead.

2              MR. HORWITZ:  The one issue, if there is a

3    witness where plaintiff made affirmative designations, we

4    made counter-designations to their affirmative designations,

5    we on our own made affirmative designations and they made

6    counter-designations.  I know we have done it both ways in

7    trial.  We would prefer to have the option for our

8    affirmative designations with their counter-designations to

9    be played during our case.

10             Their position is, for Witness A, whoever

11   supports designations or counter-designations, they should

12   only go in once.  And if they want to do it, that means the

13   whole thing goes in on their case.  We wanted some

14   clarification as to whether for our own affirmative

15   designations, with their counter-designations, whether we

16   would be able to show those in our case if we chose.

17             THE COURT:  You want to show both your

18   affirmative designations and their counter-designations at

19   the same time.

20             MR. HORWITZ:  In our case.  The issue is if

21   there is a witness where both sides have affirmative

22   designations and then both sides have counter-designations,

23   their position is, everything should go in in their case.

24   Our position is we should at least have the option, if we

25   have our own affirmative designations, to hold back those

1    affirmative designations and their counters that go along

2    with them and put them in our case so they will be in

3    context.

4              MR. FREED:  Let me tell you what that leads to,

5    Your Honor.  I just had this in another case.  It comes up

6    more frequently.

7              The problem is that in some of the instances

8    that he is referring to, there will be counter-designations

9    to one party's affirmative designations that were already

10   designations or counter-designations in the other.

11             That means the same thing is played twice and in

12   different orders.  The final ruling in the last case, for

13   whatever it's worth was, it's just like a live witness.

14   Everything comes in in the order it came in with a statement

15   to the jury:  Both parties were present.  Take not into

16   account who is asking the question, who is answering the

17   question or who is sponsoring it.  The point is this

18   happened at a deposition, and both parties had the

19   opportunity to be there.  And together they are presenting

20   this evidence to you.

21             If you do anything short of that, there is this

22   overlap issue that you have to worry about.  There is this

23   out-of-order issue that you have to worry about.  It just

24   doesn't work.

25             MR. HORWITZ:  Your Honor, we have done it both

```
1   ways.  Mr. Freed talks about what happens in trial.  I have
2   been in plenty of trials where the plaintiff calls as an
3   adverse witness a defendant's witness.  And that's governed
4   by scope of direct and cross, unless you make a deal,
5   because a person has to get back to some foreign country or
6   something.  In most cases they put him on, and we put them
7   on in our case.
8               THE COURT:  I will leave it to counsel.  I think
9   there may be exceptions on both sides that you may be
10  willing to agree to.  Sure, evidence comes in a piecemeal
11  fashion.  You have correctly described typically how it
12  comes in.  Mr. Horwitz has also described those exceptions
13  that occur.  And the rules may take account of that, the
14  rules of evidence.
15              So I am content to -- I think counsel can work
16  this out as you go along.  I don't think I need to issue a
17  broad, overarching ruling.  I am content.  It seems like you
18  are getting along okay.
19              Transitional statements, I encourage them -- you
20  have to agree on them -- from witness to witness, subject to
21  subject, to the extent you think it would help the jury.
22  All of what you do, you know, you are all experienced
23  lawyers, should be designed to inform this jury to the best
24  of your ability so that they can figure out complex stuff,
25  complex stuff you are going to asking them to figure out.
```

1    Transitional statements I believe help.

2           MR. FREED:  On transitional statements, Your

3    Honor, there are a couple kinds of them.  One is kind of a

4    mini-statement of what I think I have proved, as if it were

5    in a closing.  You are talking about what evidence is about

6    that we are about to give.

7           THE COURT:  Yes.  Similar to what your opening

8    should sound like.

9           MR. FREED:  I just wanted to make it clear.

10   Thank you, Your Honor.

11          MR. DUNLAVEY:  So that I am clear,

12   non-argumentative.

13          THE COURT:  Non-argumentative.  The openings

14   should be non-argumentative.  I want to let you know that --

15   speaking of argument, two things.  I will instruct near the

16   end of the case, you will close.  So you will close after I

17   instruct.

18          This will be a timed case.  It will be left to

19   you to decide how long you want to talk to the jury, opening

20   and closing.  But that will be a part of your time.

21          The clock runs, the multiplier is five and a

22   half hours a day.  We try to get six.  It usually doesn't

23   happen.  We will break for 15 minutes or so in the morning,

24   hour for lunch, and 15 or so in the afternoon.

25          Jury goes home at 4:30.  We start at 9.  First

1    day we will start at 9:30, because the venire won't be ready

2    till then.

3              Struck jury method.  We will put the, about 50

4    in the well of the Court.  I will ask the general questions,

5    according to the scripts you have already proposed, and then

6    we will adjourn to sidebar, put the white-noise machine on,

7    we will discuss those who responded affirmatively.  I will

8    give you an opportunity after I talk with them initially to

9    further discuss their answers with them.

10             The jury will go back to the well.  I will

11   entertain any motions for cause.  I may sua sponte dismiss a

12   juror for cause, whatever the case may be.

13             Those dismissals, rulings, will usually occur --

14   and they are usually agreed, usually everybody agrees.  You

15   have a juror who has child-care issues or something.

16             MR. FREED:  Your Honor, will our conference with

17   you be after your initial questions or after your initial

18   and our followup questions?

19             THE COURT:  No.  There is one round of

20   questions, general questions by me.  Then we will all get

21   together.

22             MR. FREED:  Got it.

23             THE COURT:  Then the pad, Ms. Walker will guide

24   you through your exercise of peremptory challenges.

25             We will recapitulate after we do the last juror

1   just so we are all on the same page, we are all in agreement

2   as to who has been dismissed for cause.

3                Any questions about the jury selection method?

4                MR. FLAGEL:  No, Your Honor.

5                THE COURT:  Your issues?

6                MR. DUNLAVEY:  Your Honor, you said that trial

7   will be recessed part of the 26th and all of the 27th.  So

8   will it be the Thursday afternoon and Friday, then we will

9   resume the following Monday?

10               THE COURT:  Monday, yes.

11               You will get the jury list typically three days

12  before.  It will have information on it regarding, it will

13  have address information, it will have age, I think,

14  occupation, gender.  I think that's pretty much it.

15               Ms. Walker will come out on the morning of jury

16  selection and have another list for you, because the list

17  that you get, that you can get from Mr. Trickey, may change.

18               Your JMOL motions, as you know, the Federal

19  Circuit requires some degree of specificity.  So you are

20  free to articulate them in some form of argument.  Usually,

21  I prefer brief argument.  I don't think the Circuit requires

22  full briefing.  You can outline, submit for filing so that

23  you can preserve your issues, you can Bench-file it,

24  electronically file the bases for your motions.

25               I will entertain at the appropriate times and

```
 1    intervals in the case your JMOLs.

 2              MR. FREED:  On that score, your formal order,

 3    formerly memorandum, now order, did rule that the motions

 4    for summary judgment were denied.  But you did make some

 5    interpretations of the contract, which is going to be very

 6    helpful for trial preparation regardless of which side we

 7    are on.  Can we take those as partial summary judgment on

 8    those issues so that we don't have to make proffers on those

 9    points and JMOLs on those points?

10              I have run into that situation.  It is kind of

11    goofy to have to do that since you have made a definitive

12    interpretation.  We don't want to make proffers that would

13    be contrary to that.

14              THE COURT:  I agree with that.

15              MR. FLAGEL:  Yes, Your Honor.

16              THE COURT:  I hadn't thought of that.  Yes.

17              MR. FREED:  You have to have it happen to you

18    once, to think about it, Your Honor.

19              THE COURT:  Other issues?

20              She says settlement.

21              I think I did note at the end, there have been

22    discussions.  I don't know if those discussions are ongoing.

23    What is the status on the settlement discussions?

24              MR. FLAGEL:  There haven't been discussions

25    recently.  This order hopefully will revive things.  For us,
```

1    we have sort of been wondering all along why we are

2    litigating a ten-dollar case.  We are trying to bridge the

3    gap.  So far we haven't been able to.  But we will keep

4    trying.

5              THE COURT:  Certainly, we would appreciate at

6    the earliest inclination that you may have an agreement in

7    principle, it doesn't have to be a final shaking of the

8    hands, but you are moving substantially in that direction.

9    It helps us.  We won't shut down.  We will continue to be

10   ready to proceed.  But it would be helpful in terms of my

11   ordering and my staff ordering our day in terms of what we

12   have to do on a day-to-day basis.  Yours isn't the only case

13   we have.

14             MR. FLAGEL:  Understood, Your Honor.

15             THE COURT:  Other issues?

16             MR. FLAGEL:  Nothing from us, Your Honor.

17             THE COURT:  Thank you for your time.  Enjoy your

18   Memorial Day weekend.  Travel safely.

19             (Conference concluded at 11:17 a.m.)

20                        -   -   -

21   Reporter:  Kevin Maurer

22

23

24

25